**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CHESTER WILLIAM INGRAM, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-08-3366 |
| | § | |
| RICK THALER, | § | |
| | § | |
| Respondent. | § | |

**MEMORANDUM AND OPINION**

The petitioner, Chester William Ingram, M.D., sues under 28 U.S.C. § 2254, challenging his 1991 state felony conviction for aggravated kidnapping. The respondent moved for summary judgment, (Docket Entry No. 18), with a copy of the state-court record. Ingram filed a response. (Docket Entry No. 22). Based on careful consideration of the pleadings, the motion and response, the record, and the applicable law, this court grants the respondent's motion and, by separate order, enters final judgment. The reasons are set out below.

## I.    Background

A Polk County grand jury indicted Ingram on December 12, 1990 for aggravated kidnaping. *Ex parte Ingram,* Application No. 68,200-01 (Event ID: 2298919) at 366. The indictment alleged that on November 8, 1989, Ingram abducted Barbara Dale Smith without her consent and with the intent to prevent her liberation by secreting and holding her in a place where she was not likely to be found with the intent to inflict bodily injury, violate and abuse her sexually, or terrorize her. *Id.*

Based on an agreement to change venue, the trial was moved from Polk County to Harris County.[1] Ingram was tried by a jury and convicted in the 263rd Judicial District Court of Harris County, Texas. *Id.* at 367-369. The case was transferred back to Polk County for sentencing by a judge. Ingram received a forty-year prison sentence. Ingram's direct appeal, petition for discretionary review, and state habeas application were unsuccessful. This federal petition was filed in November 2008. Ingram alleges prosecutorial misconduct at trial, withholding of exculpatory evidence, and trial court error. Each of these grounds is considered against the record and the applicable law.

### A.     The Applicable Legal Standards

Subsections 2254(d)(1) and (2) of the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 (AEDPA), set out the standards of review for questions of fact, questions of law, and mixed questions of fact and law that result in an "adjudication on the merits." An adjudication on the merits "is a term of art that refers to whether a court's disposition of the case is substantive, as opposed to procedural." *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000).

The AEDPA provides in pertinent part:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[1]     The Polk County Cause Number, Cause Number 12,546, was changed to Cause Number 597,877.

(2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1)   In a proceeding instituted by an application for a  writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

A state-court determination of questions of law and mixed questions of law and fact is reviewed under 28 U.S.C. § 2254(d)(1) and receives deference unless it "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States."  *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000).  A state-court decision is "contrary to" Supreme Court precedent if: (1) the state court's conclusion is "opposite to that reached by [the Supreme Court] on a question of law" or (2) the "state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at an opposite result.  *Williams v. Taylor,* 120 S. Ct. 1495 (2000).  A state court unreasonably applies Supreme Court precedent if: (1) it unreasonably applies the correct legal rule to the facts of a particular case; or (2) it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  *Id.* at 1495.  In deciding whether a state court's application was unreasonable, a federal habeas court considers whether the application was "objectively unreasonable."  *Id.* at 1495; *Penry v. Johnson,* 215 F.3d 504, 508 (5th Cir. 2000).  Questions of fact found by the state court are "presumed to be correct . . . and [receive] deference . . . unless it 'was

3

based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"   *Hill,* 210 F.3d at 485 (quoting 28 U.S.C. § 2254(d)(2)).

Pure questions of fact are governed by § 2254(d)(2).   *Martin v. Cain,* 246 F.3d 471, 475 (5th Cir. 2001).   A federal habeas court must accept as correct any factual determinations made by the state courts unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.   28 U.S.C. § 2254(e).   The presumption of correctness applies to both implicit and explicit factual findings.   *Young v. Dretke,* 356 F.3d 616, 629 (5th Cir. 2004); *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001) ("The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact.").   Deference to the factual findings of a state court is not dependent upon the quality of the state court's evidentiary hearing.   *See Valdez,* 274 F.3d at 951 (holding that "a full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to state habeas court findings of fact nor to applying § 2254(d)'s standards of review.").   Ingram's claims for relief are examined below under the applicable legal standard.

While, "[a]s a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases," *Clark v. Johnson,* 202 F.3d 760, 764 (5th Cir.), *cert. denied,* 531 U.S. 831 (2000), the rule applies only to the extent that it does not conflict with the habeas rules.   Section 2254(e)(1) – which mandates that findings of fact made by a state court are "presumed to be correct" – overrides the ordinary rule that, in a summary judgment proceeding, all disputed facts must be construed in the light most favorable to the nonmoving party.   Unless the petitioner can "rebut[ ] the presumption of correctness by clear

and convincing evidence" as to the state court's findings of fact, those findings must be accepted as correct. *Smith v. Cockrell,* 311 F.3d 661, 668 (5th Cir. 2002).

Ingram is proceeding *pro se.* Such petitions are construed liberally and are not held to the same stringent and rigorous standards as those filed by lawyers. *See Martin v. Maxey,* 98 F.3d 844, 847 n.4 (5th Cir. 1996); *Guidroz v. Lynaugh*, 852 F.2d 832, 834 (5th Cir. 1988); *Woodall v. Foti,* 648 F.2d 268, 271 (5th Cir. Unit A June 1981). This court broadly interprets Ingram's habeas filings. *Bledsue v. Johnson,* 188 F.3d 250, 255 (5th Cir. 1999).

### B.     The Evidence in the Record

#### 1.     The State's Case-in-Chief

The complainant, Barbara Dale Smith, testified at trial. Smith was thirty-eight years old when she testified. She worked as a sales representative for a pharmaceutical company. (Reporter's Record, Vol. XII, pp. 1299, 1335). Smith testified about the events leading up to what she alleged was a rape by Ingram.

Ingram was one of the physician clients Smith visited on Tuesday, November 7, 1989. Smith testified that she arrived at his office in Livingston, Texas around 5:00 p.m. (Reporter's Record, Vol. XII, pp. 1373, 1376-1377). She explained she went to Ingram's office at the end of the day because he usually kept sales representatives waiting a long time before seeing them. (*Id.* at 1370-71). She showed Ingram some samples, and he asked her to dinner. (*Id.* at 1379-1380). She accepted the invitation, and they discussed what hotel she should stay in. (*Id.* at 1380). Smith testified that her relationship with Ingram had always been a "business-client relationship." She believed that a dinner was a way to build rapport with him. (*Id.* at 1381, 1383). She thought her company was going to pay for the meal. (*Id.* at 1381).

5

The day before she went to Livingston, Smith had decided not to wear her wedding ring because the diamond had fallen out and the remaining prongs were sharp and dangerous. (Reporter's Record, Vol. XIX, pp. 1352-54).  One of the prosecutors on the case, Diane Bull, testified that Smith's wedding ring was missing a diamond.  (*Id*. at 3454-3456, 3458, 3460).

Smith testified that after she left Ingram's office, she went to buy a dress because she did not want to wear the same suit she had been wearing all day and only had one change of clothes with her.  (Reporter's Record, Vol. XII, p. 1384).  Ingram called her at her hotel and said that he was running late and would pick her up at around 7:00.  He asked if she liked Chinese food and whether she had a restaurant preference.  (*Id*. at 1385-1386).  She told him to choose because she did not know Livingston very well.  (*Id*. at 1386).

Smith testified that she went to the hotel lobby to check her messages and to leave a message for her husband that she was going to have dinner with Ingram and would be back at the hotel between 9:00 and 10:00 p.m.  (Reporter's Record, Vol. XII, p. 1387).  She had to use the lobby phone because the room phone did not have the right kind of dial.  She thought her remote answering machine might have failed to record the message.  (*Id*. at 1389-1391).  Smith was married to James Earnest Smith, also known as "Rowdy."  (*Id*. at 1299, 1335).  The couple had three children.

John King, the hotel manager, testified that he overheard the call.  He heard Smith say that she was going to have dinner with Ingram and return around 10:00 p.m.  (Reporter's Record, Vol. VII, p. 140).  King described Smith as "friendly" and "outgoing."  (*Id*. at 137).  He did not think she was flirtatious.  He described her clothing as business attire when she checked in and a dress "you'd wear to church" when she left with Ingram.  (*Id*. at 138, 141).  He did not think there was anything

provocative about the dress.  On cross-examination, Ingram's defense counsel, DeGuerin, asked if the prosecutor had suggested that he describe the dress as a "church dress," because King had not used those words in prior testimony.

Smith testified that Ingram arrived at her hotel room dressed in athletic wear.  (Reporter's Record, Vol. XII, p. 1393).  He apologized for being late and said he thought that they would stop at his house on the way to the restaurant so he could change.  (*Id*. at 1393).  When Smith got into his car, she saw that Ingram had picked up take-out food.  (*Id*. at 1394).  Ingram explained that he picked the food up after he realized that he was running late.  He said he did not think she would mind eating at his house.  (*Id*. at 1394).  Smith agreed.  (*Id*. at 1395).

When they arrived at Ingram's house, they went outside to feed his horse and cats. (Reporter's Record, Vol. XII, pp. 1397-98).  Ingram told her that his wife and kids had moved out. (*Id*. at 1398-1399; Reporter's Record, Vol. XIII, pp. 1587, 1593).  Once inside the house, Ingram put the food in the microwave, poured two glasses of wine, and took a shower.  (Reporter's Record, Vol. XII, p. 1401).  He came back from the shower barefoot, wearing blue jeans and a shirt. (Reporter's Record, Vol. XIII, p. 1431).  Ingram asked whether Smith was married.  (*Id*. at 1426). She responded that she was.  (*Id*. at 1426).  Ingram showed her around his house.  (*Id*. at 1427).  At dinner, they talked about her medical products and about how her work took her away from her family.  (*Id*. at 1434-1437).

Smith told Ingram that she was ready to leave at 8:00 p.m.  (Reporter's Record, Vol. XIII, p. 1438).  Ingram then said that he did not need to get up early the next day and that "we can sleep as late as you want."  (*Id*. at 1438).  Smith testified that she stood up and asked, "what are you talking about?"  (*Id*. at 1438).  Ingram then grabbed her shoulders and said "you're not going

anywhere except to bed." (*Id*. at 1440).  The jury could see that Ingram was much larger than Smith. (*Id*. at 1439).  Smith pleaded with Ingram to stop.  (*Id*. at 1441).  Ingram laughed and pushed her into the bedroom.  (*Id*. at 1441).

Smith testified that she fought, but Ingram threw her across the bed.  (Reporter's Record, Vol. XIII, pp. 1442-1443).  She reached for the phone, and he grabbed it out of her hand.  (*Id*. at 1443-1444).  She scratched him as he tried to take her clothes off.  (*Id*. at 1444-45).  Ingram became angry and yelled, "don't scratch me [d]on't leave a mark."  (*Id*. at 1445).  Smith was frightened that Ingram was going to kill her.  (*Id*.).  Ingram pulled her dress up over her head and pantyhose down. (*Id*.).  Smith continued begging him to let her go.  (*Id*. at 1446).  She testified that he raped her five times over a period of about five hours.  She described going into a "state of shock."  Smith testified that the final time he raped her was extremely violent.  She begged him not to kill her.  At some point, Smith started agreeing with him, for example, when he would say, "you be my girlfriend," planning to run when she could.  (*Id*. at 1451-1452).  Smith testified that Ingram got more violent every time he raped her.  (*Id*. at 1459-1460).  She testified, "he wouldn't let me move.  He was, he had me, he had me like an animal."  (*Id*. at 1460).  Smith felt pain while he was raping her.  She testified that Ingram also said, "I'm not going to kill you . . . I've done what I wanted to do . . . I've climaxed in you.  That's what I wanted to do.  Since the time I first saw you, I was going to do that. . . . Barbara, I'm sorry.  I know I'm raping you."  (*Id*. at 1447).

Ingram finally allowed Smith to get up and get some water from the bathroom.  Although he followed, she hid her watch in the waste basket.  (Reporter's Record, Vol. XIII, pp. 1449, 1460-1462).  Smith testified that she also slipped her bracelets off and hid them under the sheets to leave

evidence that she had been there.  (*Id*. at 1463).  Her other jewelry came off while he was tearing off her clothes.

After raping her the last time, Ingram either went to sleep or passed out.  (Reporter's Record, Vol. XIII, p. 1471).  When she was sure he was asleep, she got out of the bed and went into the living room.  (*Id*. at 1474).  She grabbed a cork screw and tried to hide it in a Bible, thinking she would use it on Ingram if he woke.  (*Id*. at 1474-1475).  She decided to run, but not to use his car because that would require her to go around the house.  She did take his keys and the Bible.  She ran down the road away from the house, naked.  She threw the keys and Bible because she thought it would help her run faster.  (*Id*. at 1479-80).  She climbed over a fence, ran up to a house, rang the doorbell, and begged to be let in.  (*Id*. at 1481-82).  The occupant of the house let her in.  The police were called and Smith was taken to the hospital.  (*Id*. at 1483-1484).

On cross-examination, Smith could not remember whether she had heard before November 7 that Ingram was divorced.  (Reporter's Record, Vol. XIII, p. 1517).  Defense counsel asked if she consulted other drug representatives in the area about the best times to call on doctors.  (*Id*. at 1502).  She admitted that she had previously testified that Ingram asked her if "take out" food was acceptable.  (*Id*. at 1570-1571).  Defense counsel questioned Smith about what she had worn and whether it was revealing.  Counsel asked her about whether she knew no one else was at his house, that Ingram was divorced, and that he knew that she was not wearing a wedding ring.  (*Id*. at 1593).  Defense counsel asked Smith if the events she had described, including driving to the house, seeing the barn, Ingram pouring the glasses of wine, Ingram showing her the house, Ingram taking a shower, and their eating dinner together, all took place between 7:00 and 8:00 p.m.  (*Id*. at 1639).

9

Smith acknowledged that she had filed a worker's compensation claim against her employer and a civil lawsuit against Ingram for the rape. (Reporter's Record, Vol. XIII, pp. 1604-1605, 1612). Counsel asked Smith if she had falsely claimed to be discussing her product line during dinner to recover worker's compensation. (*Id.* at 1605).

Smith admitted on cross that when she spoke with the prosecutor the day after the rape, she did not remember that Ingram had carried her from the dinner table to the bedroom. (Reporter's Record, Vol. XIII, p. 1616). She admitted that at one point during the rape she was on top of Ingram and that, at one point, she put his penis in her. (*Id*. at 1631). She admitted telling him she was happy to be there. (*Id.* at 1632-33). She could not remember what she said when Ingram invited her to come back the following night. (*Id*.).

On redirect, Smith testified that she remembered how she got from the dinner table to the bedroom while she was reenacting the scene for the prosecutor at Burger King one year after the rape. (Reporter's Record, Vol. XIV, p. 1809). She clarified that she and Ingram did not act as lovers. Instead, he made her do the sexual acts she described. (*Id.* at 1822).

The neighbor Smith fled to, Anna Katherine Sullivan, testified. (Reporter's Record, Vol. VII, pp. 154-55). Her home was three blocks away from Ingram. On November 7, 1989, she was awakened by the doorbell. (*Id*. at 156, 169). She went to the door and found a "naked lady . . . screaming and hollering 'I have been raped.'" (*Id*. at 169-170). She testified as follows:

> I turned the light on. She told me to turn the light off, "please, turn the light off. He's going to kill me," and I shut the door and went to the back and got my pistol. I came back to the front door and I let her in and I let her know that I had my pistol. I looked all around the yard and my light was not on. And she came in and I put her in the seat. All she had in front of her, she had picked up my doormat and put it in front of her to hide her nudeness. . . . She was very hysterical, very hysterical.

10

(*Id*. at 177-78).  Sullivan called the Sheriff's Office and talked with a dispatcher, who, in turn, talked

to Smith.  (*Id*. at 178).  Sullivan did not allow Smith to call her husband because she wanted to keep

talking with the dispatcher in case someone did come after Smith.  (*Id*. at 178-179, 181).  Sullivan

did not see any marks or bruises on Smith.  (*Id*. at 181).

Cindy Cardwell, the dispatcher at the Polk County Sheriff's Department, took a call from

Sullivan at about 2:15 a.m. on November 8, 1989.  (Reporter's Record, Vol. VII, pp. 183, 188).  She

spoke with Sullivan and then Smith.  Smith reported that Ingram attacked her, and she thought he

was going to kill her.  Cardwell used a scrambled channel to dispatch Deputy Shotwell to the scene.

(*Id.* at 190-91).  Ingram called Cardwell at 3:38 a.m. and asked if Barbara Smith was there.  He said

that he could not find his keys.  (*Id.* at 192-193).

Deputy Shotwell from the Sheriff's Department came to Sullivan's house about twenty

minutes after the dispatch call.  Smith was "still hysterical and crying."  (Reporter's Record, Vol.

VII, p. 179).  Smith did not smell of alcohol or appear intoxicated.  (*Id*. at 179).  Deputy Shotwell

took Smith to the Polk County Hospital.  (*Id*. at 208-209).  One of the hospital clerks told him that

Ingram had called looking for Smith.  (*Id*. at 209-10).  Deputy Shotwell told the clerk to say that

Smith was not there.  (*Id. at* 210-211).  Shotwell then called an investigator with the Sheriff's

Department.  (*Id*. at 211).  Ingram subsequently showed up at the hospital with scratches on the right

side of his neck.  (*Id*. at 212).  At 7:30 a.m., Deputy Shotwell was told to go to Ingram's house and

secure it until a search warrant could be obtained.  (*Id*. at 215).

Judy Carol Wells, an emergency room nurse, also testified.  On November 7, 1989, she was

at the nursing station.  Deputy Shotwell told her that a lady claimed that Ingram had raped her.

(Reporter's Record, Vol. VII, pp. 233-34, 237, 239).  Wells found Smith "sobbing hysterically . .

11

. crying and saying 'Is it, over, is it over?  It was a nightmare.  It was horrible.  It was a nightmare. Is it over?'" (*Id*. at 240, 249).  Wells testified that Smith required a lot of reassurance and would periodically lapse into hysteria.  (*Id*. at 249).  Smith's pulse was elevated and her respiratory rate high.  Wells took pictures of Smith's injuries.  (*Id*. at 257).  Wells was present during the pelvic examination and saw Smith cry out in pain.  Because Smith expressed fear of Ingram, Wells asked that the doors to the hospital be locked.  During the physical examination of Smith, officers were stationed outside the door.  (*Id*. at 260).

Wells saw Ingram at the hospital.  (Reporter's Record, Vol. VII, pp. 260-261).  She saw some redness on Ingram's neck.  Wells testified that a few weeks after she started working at the hospital, Ingram had asked her out to dinner and asked if she liked Chinese food.  She thought they were going to a restaurant, but when she got in the car, she saw take-out.  Ingram said he picked up some Chinese food and that they could eat it at his house and she could see his horses.  (*Id*. at 247).

Aurora Peden was the emergency room clerk on duty on the night of November 7, 1989. (Reporter's Record, Vol. VII, p. 242).  She testified that she received a call at 3:00 a.m. from someone asking if Barbara Smith had been admitted.  Peden had been instructed not to tell anyone that Smith was there.  She lied and told the caller that no one by that name had been admitted. Peden recognized Ingram's voice.  (*Id*. at 296).  At 3:30 a.m., Ingram called and identified himself. He asked if Barbara Smith had been admitted.  Peden again lied and said that Smith had not been admitted.  Peden saw Ingram in the hospital at 4:00 a.m.

Dr. Raoul Perez Aclave testified that he treated Smith on November 8, 1989 at about 3:50 a.m.  (Reporter's Record, Vol. VIII, p. 334).  He testified that although he knew Smith as a drug company representative, he initially did not recognize her because she was "crying, sobbing, was

12

very upset, very agitated, anxious. . . fragile." (*Id*. at 334-35).  Perez wrote in his report: "'Patient complained of being . . . kept hostage against her will and being raped several times.'" (*Id*. at 1832-33).  Perez said he took a history beginning with the events of the prior night.  The history took approximately two hours and forty minutes to complete because Smith was having a hard time keeping her composure.  (Reporter's Record, Vol. VIII, pp. 335-36).  Perez said that Smith told him that Ingram had had sexual intercourse with her, had penetrated her female genitalia, and had climaxed.  (*Id*. at 342).  Smith said she had never had any venereal diseases.  (*Id*. at 345).

Perez found that Smith had abrasions and scratches on her right shoulder and the lower part of the back.  She had two long scratches, one on her left side that she said was caused by a fence, and one running up the body, about one and one-half inches long.  (Reporter's Record, Vol. VIII, pp. 348-52).  Dr. Perez said that when he examined Smith, she complained of soreness.  Smith's labia were "significantly reddened" and "swollen."  (*Id*. at 362-63, 372).  Perez said that bruising may take eight to ten hours to appear.  (*Id*. at 370).  Perez noted that the vaginal walls and cervix were reddened.  (*Id*. at 372).  Perez said that the external reddening was consistent with intercourse - not necessarily forceful or prolonged - but that the internal reddening was consistent with "vigorous" intercourse.  (*Id*. at 389).  Perez testified that in 13 years of practice, he had never seen anybody with as much diffuse redness.  (*Id*. at 413).  Perez found sperm that were intact, suggesting that the sexual intercourse took place very recently.  (*Id*. at 392-95).

On cross-examination, Perez testified that Smith had a history of vaginitis, which could cause reddening, and that she had complained of vaginal discharge.  (Reporter's Record, Vol. VIII, pp. 414-19).  He again said that he had not seen such diffuse reddening in other women.  (*Id*. at 424).

13

Perez did not see any bruises on Smith's arms, wrists, shoulders, back, chest, stomach, legs, or feet. (*Id*. at 443-44).

On cross-examination, Perez acknowledged that normal intercourse could cause tenderness and swelling.  (Reporter's Record, Vol. VIII, p. 464).  Perez reviewed notes from Dr. Caskey, who saw Smith the next day.  Caskey found an abrasion and a separation injury between the labia majora and the labia minora on the right side, approximately three centimeters in length.  Perez explained that he did not find that abrasion due to the swelling, which would have subsided by the next day when Caskey examined Smith.  (*Id*. at 460-61).

James Michael Nettles, Chief Deputy with the Polk County Sheriff's Department, testified that he had been called in to help investigate Smith's case.  (Reporter's Record, Vol. VIII, pp. 491-93).  He turned the rape kit over to Tommy Walker, a Texas Ranger, who took it to the Texas Department of Public Safety in Houston.  (*Id*. at 494, 530).  Nettles saw Ingram at the hospital at 4:40 a.m. on November 8, 1989.  Nettles saw scratch marks on Ingram's neck and redness under his eye.  (*Id*. at 497-98).  Nettles read Ingram his *Miranda* rights, even though he was not under arrest at that time.  (*Id*. at 499).  Ingram asked Nettles if Smith had his car keys.  (*Id*. at 499).  Nettles told Ingram that he had not asked Smith whether she had the keys.  Nettles said that he was investigating a sexual assault complaint and Ingram was a "suspect."  (*Id*. at 500-501).  Nettles testified that Ingram did not ask about Smith's health while at the hospital or deny any involvement in the rape. (*Id*. at 532).

On cross-examination, Deputy Nettles admitted that he had previously testified that he did not recall seeing any red marks on Ingram's face.  (Reporter's Record, Vol. VIII, p. 511).  Nettles testified about the search of Ingram's home.  Ingram's lawyer, Bill Jones, was present when law

enforcement officers searched his house.  (*Id*. at 530-531).  Nettles recalled seeing an empty bottle of wine and wine glasses.  (*Id*. at 515, 526).  Smith's jewelry was on the carpet in the bedroom, and her purse was on the table.  (*Id*. at 525, 527).

Dr. William E. Watson, an optometrist and friend of Ingram's, testified that he played racquetball with Ingram at 6:00 p.m. on November 7, 1989.  (Reporter's Record, Vol. VII, pp. 98-100).  Dr. Watson saw Ingram the night after the alleged kidnaping and assault.  Ingram recounted the events and told him he and Smith had consensual sex.  (Reporter's Record, Vol. XIX, p. 3329; Reporter's Record, Vol. VII, pp. 107-108).  Ingram had a spot – not a scratch – on his neck.  (*Id*. at 109).  Dr. Watson did not see injuries under Ingram's eyes when they played racquetball. (Reporter's Record, Vol. XIX, p. 3327).

Tommy Walker, a Texas Ranger, responded to Deputy Nettles's call for help in the investigation on November 8, 1989.  (Reporter's Record, Vol. X, pp. 862, 868).  Walker arrested Ingram at 6:20 a.m.  (*Id*. at 873).  Ingram had bloody scratches on the upper part of his right arm, three scratches in the armpit area, a small scratch on his chest, a longer scratch running horizontally to his shoulder, scratches on his neck that were almost bleeding, scratches just below his collarbone, one running from his Adam's Apple down across his chest, small blisters or welts, a red scratch under his left eye and a smaller one under his right eye, and a dime-sized abrasion on his left elbow. (*Id*. at 867, 877-878-79, 893-901).  One of the scratches on his left arm was about six inches long, the one on his neck was three inches long, and other abrasions were about a half inch each.  (*Id*. at 907-908).

Ingram consented to the search of his home.  (Reporter's Record, Vol. X, p. 912).  Mike Nettles, Bill Jones, Terry Brown, the Polk County District Attorney, and Eddie Butler, a Sheriff's

deputy, conducted the search.  They were accompanied by Bill Jones, Ingram's attorney.  (*Id*. at 912, 914).  In the bedroom, Walker noticed a shoe inside undamaged pantyhose and a dry washcloth.  (*Id*. at 940-941, 974; Reporter's Record, Vol. XI, pp. 1111, 1120).  A pair of panties was on the floor.  (Reporter's Record, Vol. X, p. 941).  A bra and a blue and black dress were on the side of a trash can at the foot of the bed. Both items of clothing appeared undamaged.  (*Id*. at 941, 948; Reporter's Record, Vol. XI, pp. 1106-1109).  The dress was inside out and unbuttoned.  (Reporter's Record, Vol. X, p. 946; Reporter's Record, Vol. XI, p. 1106).  Deputy Walker found a bracelet, an earring, another bracelet, and a necklace in the bedroom.  The bracelet was unclasped.  Smith's wristwatch was at the bottom of a trash can in the bathroom, buried under other trash.  (Reporter's Record, Vol. X, pp. 987-988).  While inventorying Smith's purse, Walker found her wedding band, an engagement ring, and a room key.  (*Id*. at 991, 995; Reporter's Record, Vol. XI, pp. 1183-1187).

The bed sheets and pillow cases were submitted to a DPS lab in Houston.  (Reporter's Record, Vol. X, p. 956).  There were blood stains on the sheets and a small bloodstain on a pillowcase.  (*Id*. at 959-960).  Two of the stains on the bed sheets matched the scratches on Ingram's arm.  (*Id*. at 961-962).

Ranger Walker also testified that the area around Ingram's home was searched.  (Reporter's Record, Vol. X, p. 1008).  Officers found the Bible between Ingram's and Sullivan's house but did not find the keys.  (*Id*.; Reporter's Record, Vol. XI, pp. 1168-1169).

Maurita Howarth, a criminalist with the DPS, analyzed the samples taken from Smith.  (Reporter's Record, Vol. XI, pp. 1211-1212).  Howarth examined a vaginal swab and a vaginal smear for the presence of semen.  (*Id*. at 1213-1214).  Ingram was a "non-secretor," meaning that his blood type, O, would not show up in his bodily fluids.  (*Id*. at 1219).  Smith was a "secretor"

16

with blood type O.  (*Id*. at 1220).  Michelle Wiskowski, Ingram's girlfriend, was a "non-secretor" with an unknown blood type.  (*Id*. at 1222).  Howarth concluded that there was semen in Smith's vagina,  consistent with a body fluid from a "secretor" with blood type O.  (*Id.*)

Howarth also examined pillowcases, a sheet, and some clothing.  (Reporter's Record, Vol. XI, p. 1225).  There were twenty-five spots on the sheet that did not appear to contain semen and thirteen spots containing semen.  (*Id*. at 1235, 1238-1240).  Howarth identified eighteen blood spots on the bed.  (*Id*. at 1241-43, 1249).  No blood was found on the panties or pantyhose.  (*Id*. at 1249).  The washcloth contained indications of semen.  (*Id*. at 1232-1233).  On cross-examination, Howarth admitted that she did not know the age of any of the spots.  (*Id*. at 1258).

Dr. Charles J. Caskey testified that Smith was a regular patient.  On November 9, 1989, she was "extremely upset" and "disassociated . . . staring off into space."  (Reporter's Record, Vol. IX, p. 573).  Dr. Caskey referred her to a psychiatrist, Dr. John Halbert.  (*Id*. at 573-574, 644).  Smith came back later that day, after having seen Dr. Halbert.  Dr. Caskey agreed to examine Smith at the request of Diane Bull, the assistant district attorney for Polk County.  (*Id*. at 576-577, 644).  Dr. Caskey saw an abrasion on her left thigh, which she said was from climbing over a fence.  (*Id*. at 578-577).  He also noticed a "separation-type" injury between her labia majora and labia minora, measuring approximately one inch, and that the labia were swollen and red.  (*Id*. at 579).  Smith had a half-inch hematoma on the "prepuce of the clitoris."  (*Id*. at 582).  Caskey saw that her cervix was bruised or bluish, but his internal examination did not reveal injuries.  (*Id*. at 584).  Caskey concluded that her vagina and the vulva were traumatized either by a hand, some other part of the body, a foreign object, or by prolonged intercourse.  (*Id*. at 585).  The trauma Caskey saw was not consistent with normal intercourse.  (*Id*. at 594).  Dr. Caskey testified on cross-examination that

Smith's tearing injury was not produced by normal intercourse, but was consistent with rape. (*Id.* at 698-699). Her other injuries could have been caused by prolonged or vigorous intercourse. (*Id.* at 700-703).

On cross-examination, Dr. Caskey testified that he had seen Smith about forty-six times since 1973. On several occasions between 1973 through 1989, she complained of vaginal discharge. (Reporter's Record, Vol. IX, pp. 633-635, 637). On redirect, Dr. Caskey testified that in 1979, Smith had seen another doctor for depression, possibly associated with her children's health problems. (*Id.* at 657). Smith's medical records also showed that Smith and her husband, Rowdy, had been treated for Trichomonas, a sexually transmitted disease. (*Id.* at 745, 748-751). In June 1985, Smith saw Dr. Caskey for a rash and also told him that she was under an increasing amount of stress. (*Id.* at 770-771). In 1987, she complained to him about anxiety and nervousness related to job stress. (*Id.* at 784-786).

Jane Flannigan also testified. She was the administrator for the Employee Assistance Program for Smith's employer. (Record, Vol. XIV, p. 1951). As a result of her conversations with Smith, Flannigan observed symptoms of post-traumatic stress disorder ("PTDS"), including irrational anger followed by a period of apology, tremendous distrust of other people, and paranoia. (*Id.* at 1970-71).

### 2.     The Defense's Case-in-Chief

Ingram testified that he did not rape or kidnap Smith. (Reporter's Record, Vol. XVIII, p. 2853). Ingram testified that in August 1989, Smith and her daughter came to his office. (*Id.* at 2876-2875). He invited both to come to his ranch for dinner and horseback riding the next time they

18

were in Livingston together.  (*Id*. at 2877-2878).  Smith reacted very positively to the invitation.  (*Id*. at 2876).

On November 7, 1989, Smith came to his office around 5:00 p.m.  (Reporter's Record, Vol. XVIII, p. 2880).  Ingram's wife had left him, and he was living in the family house by himself.  Normally, drug reps came by between noon and 2:00 p.m.  (*Id*. at 2871).  Ingram thought Smith seemed flirtatious.  (*Id.* at 2883).  Smith said that she had several other doctors to see in Livingston.  (*Id*. at 2887).  Ingram asked whether she planned on staying overnight.  She said that she would not normally do so.  (*Id*. at 2886-2887).  Ingram asked her to supper.  She accepted and asked about hotels.  (*Id*. at 2892-2893).  Ingram testified that her question struck him as "coy and flirtatious."  (*Id*. at 2893-2894).  From her reactions, Ingram thought Smith was encouraging him.  (*Id*. at 2896).

When Ingram made the arrangements with Smith, he thought they would go out to eat.  (Reporter's Record, Vol. XVIII, p. 2900).  After finishing a prearranged racquetball game, he called Smith.  (*Id*. at 2902-2903).  Ingram told Smith that he needed to go home and shower and recommended that they order take-out and eat at his house.  (*Id*. at 2904).  He called back a second time to find out what room she was in.  (*Id*. at 2906).  She was not hesitant about giving him her room number, and she did not suggest that he pick her up in the lobby.  (*Id*. at 2906-2907).  He arrived at her room about 7:00 p.m. dressed in athletic clothes.  (*Id*. at 2909).  He knocked on the door, and she let him in while she put her shoes on.  (*Id*. at 2912-13).  He thought her dress was provocative.  (*Id*. at 2915-2916).

At the house, Ingram asked her about not wearing a wedding ring.  (Reporter's Record, Vol. XVIII, p. 2929).  They went out to feed the horses.  He took her hand to help her over a ledge into

the barn.  (*Id*. at 2924).  He took the fact that she did not recoil as a positive sign.  (*Id*. at 2925).
They finished looking at his property at about 8:30.  (*Id*. at 2928).  Smith suggested that Ingram get
cleaned up before eating.  (*Id*. at 2930).  He took a bath, leaving Smith with a glass of wine.  (*Id*. at
2935-2936).  He put on a shirt and a pair of blue jeans and came back into the dining room around
9:00 p.m.  (*Id*. at 2937).  He put some music on, and they ate and talked about business.  (*Id*. at
2939-2940).  At one point, Smith asked Ingram, "Do you think I'm flirting with you?"  (*Id*. at 2940).
He said, "Yes, I think you are."  (*Id*. at 2940).  Ingram testified that Smith said she was separated
from her husband.  (*Id*. at 2942).

Ingram received a phone call from Shirley Campbell, an employee.  (Reporter's Record, Vol.
XVIII, p. 2941; Vol. XV, pp. 2173-2174).  After finishing his phone call, he came over to Smith and
kissed her.  (Reporter's Record, Vol. XVIII, p. 2943).  He then stood up and said, "Barbara, let's go
back to the bedroom."  She did not resist.  (*Id*. at 2945).  Ingram testified that he carried her into the
bedroom.  (*Id*. at 2945).  She unsnapped her dress and took off her jewelry and dropped it on the
floor.  (*Id*. at 2949-2950).  They had consensual sex.  (*Id*. at 2947-2953).  At one point, she got on
top of him and placed his penis inside her.  (*Id*. at 2953).

After they had sex the first time, Smith said she wanted to go back to the hotel because she
was expecting a phone call from her husband.  (Reporter's Record, Vol. XVIII, pp. 2955-2956).  He
was a little surprised because she had said that she was separated.  He asked whether she was going
to get into trouble.  (*Id*. at 2956).  She said no.  He asked her to stay the night, and she agreed.  (*Id*.
at 2956).  They had sex twice.  (*Id*. at 2960).  She scratched him accidentally when she was on top
of him during the sex.  (*Id*. at 2960-2961).

Ingram fell asleep and awoke around 2:00 a.m. Smith was gone. (Reporter's Record, Vol. XVIII, pp. 2967-68). When he could not find her, he thought she might have walked back to her hotel, about two and one-half miles away. (*Id*. at 2970). He started looking for his car keys so he could give her a ride. (*Id*. at 2970). He called her hotel room. (*Id.* at 2971). He looked for his keys in his bedroom, picking her dress and bra off the floor and placing them on the edge of a trash can. (*Id*. at 2972). He then got on a four-wheeler and drove up and down the road looking for her. (*Id*. at 2973). He passed Sullivan's house without noticing anything unusual. (*Id*. at 2973). He called the hotel, the sheriff's office, and the hospital, then called Campbell to borrow her car. (*Id*. at 2975, 2977).

Ingram drove to the hospital at around 3:00 or 3:30 a.m. A clerk said that Smith had checked in. (Reporter's Record, Vol. XVIII, p. 2982). Deputy Nettles gave him a "routine legal warning" and told him that he was "under suspicion." (*Id*. at 2982). He was told not to say anything. (*Id*. at 2983, 3158). That warning prevented him from telling his side of the story, which he wanted to do at the time. (*Id*. at 2983). He left, drove to his office, retrieved his extra set of keys, and returned Campbell's car. (*Id*. at 2984). He drove through bushes and briars getting to and from Campbell's home. (*Id*. at 2985).

Ranger Walker came to Ingram's house along with another deputy. (Reporter's Record, Vol. XVIII, p. 2987). Ingram gave them a taped statement. (*Id*. at 2987). Walker and the deputy took photographs. Ingram explained that the marks on his shoulder were from hitting a tree branch in the woods, and the neck scratches and elbow injury came from consensual sex and Smith. (*Id*. at 2990). The red marks on his face were from his racquetball goggles. On cross-examination, the prosecutor asked how Ingram injured his elbows. He said it was playing racquetball or falling from a horse.

21

(*Id*. at 2997).  The prosecutor asked Ingram whether he frequently had red marks from the goggles he used during racquetball.  Ingram testified that he thought that Smith falsely claimed to have been assaulted because she was afraid of her husband.  (*Id*. at 3033).  Ingram testified that Smith ran out of his house naked because she had worked herself into a state of hysteria and deliberately removed her clothes before running down the street.  (*Id*. at 3032).

The prosecutor pointed out inconsistencies in Ingram's testimony.  Ingram had initially told his friend, Dr. Watson, that Smith and he did not engage in oral sex, contradicting his trial testimony.  (Reporter's Record, Vol. XIX, pp. 3199-3200).  During the interview on the morning of November 8, Ingram did not mention to Ranger Walker that he received the scratches from driving through bushes and underbrush.  (*Id*. at 3226-3231).  Ingram told law enforcement that Smith's arrival at his office around 5:00 p.m. was a little bit late since sales reps normally came by at around 4:00 or in the "last five minutes."  (*Id*. at 3253-3255).

Mary Dickerson testified in the defense case.  She worked for Ingram as an x-ray technician in November 1989.  She saw Smith on November 7 after 5:00 p.m. in Ingram's office.  (Reporter's Record, Vol. XV, pp. 2023, 2028, 2030-2031, 2044).  Smith and Ingram were sitting on a couch in his office, talking.  (*Id*. at 2034).  Smith looked surprised when Dickerson walked in.  (*Id*. at 2038).  Dickerson thought Smith's prior visit with her daughter to Ingram's office was "unprofessional" and "too friendly."  (*Id*. at 2041).

Linda Sue Nash also testified.  She worked for Ingram at the front desk.  (Reporter's Record, Vol. XV, pp. 2130, 2134).  She noticed the Friday before November 7 that Ingram had a big scab on his left elbow.  It was not unusual for Ingram to have scratches on his arms from riding horses.  (*Id*. at 2133).  She called Ingram at home around 9:00 to 9:10 p.m. on November 7.  (*Id*. at 2173-

22

2174).  She heard music in the background.  He was eating when he answered the phone.  (*Id*. at 2175-2176).  She received a phone call from Ingram around 2:00 a.m. on November 8 asking to borrow her car.  (*Id*. at 2179-2181).  Ingram said that his car would not run or that he could not find his keys.  (*Id*. at 2182).  He drove a three-wheeler to her house.  (*Id*. at 2182).  He returned the car around 4:00 a.m., gave her the keys, and said, "I'll see you in the morning, I hope."  (*Id*. at 2184-2185).  At the meeting the following day, she noticed scratch marks on his neck.  (*Id*. at 2188).

Dr. Raymond A. Neumann was a physician in Livingston, Texas and a business partner of Dr. Ingram's.  They owned a piece of lab equipment together.  (Reporter's Record, Vol. XV, pp. 2287, 2290).  Smith visited his office on November 7, 1989 and left drug samples.  Dr. Neumann felt that Smith's body language had a "pretty strong sexual overtone."  (*Id*. at 2302).

Norman Beard testified as well.  He worked for Dr. Neumann as an x-ray technician on November 7, 1989.  He noticed that Smith was wearing a "provocative looking" dress with a "slit" when she visited Dr. Neumann.  (Reporter's Record, Vol. XV, p. 2266).

Dr. Robert Jordan, a former medical examiner for Harris County, Texas, testified about rape kits.  (Reporter's Record, Vol. XVI, pp. 2461-2467).  He testified that based on his experience, a clawing action by a woman would draw blood, which could be detectable on testing.  (*Id*. at 2468).  But he also said that in a majority of the cases he had worked on, there was no blood under the victim's fingernails.  (*Id*. at 2476).

Floyd McDonald testified.  McDonald was a toxicologist.  He had worked with the DPS and a police department.  (Reporter's Record, Vol. XVI, pp. 2490-2492).  McDonald testified that if a woman had scraped an attacker and drawn blood, her fingernails would have blood under them.  (*Id*. at 2495-2499).  He expected blood to be under Smith's fingernails.  (*Id*. at 2499-2500).

23

James Ray Hays, a clinical psychologist at the University of Texas Medical School in Houston, testified.  (Reporter's Record, Vol. XVII, p. 2628).  He reviewed Smith's psychological tests.  (*Id*. at 2634).  Smith's IQ was 87.  (*Id*. at 2636).  She scored below 70 on the Minnesota Multiphasic Personality Inventory (MMPI).  (*Id*. at 2644-26, 2684).  The MMPI is used to interpret personality pattern. (*Id*. at 2643).   The test measures hysteria, depression, hypochondriasis (psychological condition), psychopathic deviate, masculinity-femininity, paranoia, psychasthenia (obsessive compulsive), schizophrenia, hypomania (energy level), and social introversion.  (*Id*. at 2652-2656).  Most individuals fall between 30 and 70 on the MMPI.  (*Id*. at 2652).  People scoring above 70 are "extremely psychological" or "have various kinds of psychotic disturbances."  (*Id*. at 2652).

Smith's January 1990 MMPI showed some depression.  It also showed that she was "attempting to present herself in a very virtuous light" and to answer questions "in a socially conforming way."  (Reporter's Record, Vol. XVII, pp. 2657-2658, 2662).  Hays concluded that Smith did not suffer from PTSD.  (*Id*. at 2660-2662, 2711).  He thought Smith was guilty of "confabulation" because for the first year after the incident she could not remember how she got from the dining room table to Ingram's bedroom.  She remembered only after she was questioned by the prosecution.  (*Id*. at 2666-2671).  Hays testified that the lack of memory could come from "physical trauma," alcohol, embarrassment, or repression.  (*Id*. at 2673-2674).  Smith also admitted on the test that she liked to flirt.  (*Id*. at 2676).

On cross-examination, Dr. Hays said that Smith's scores did not indicate that she was malingering or faking to win a monetary award from Ingram.  (Reporter's Record, Vol. XVII, pp. 2731-2734).

24

### 3.      The State's Rebuttal Evidence

Dr. Aurelio Espinola testified that he was the Chief Medical Examiner for Harris County, Texas.  (Reporter's Record, Vol. XIX, p. 3272).  His opinion was that the marks below Ingram's eyes could not have been caused by eyeglasses or a hand, but were consistent with a type of pressure-related injury one might incur when holding someone down and rubbing up against someone's hair or against linen.  (*Id*. at 3280-3282).  He also testified that the scratches on Ingram's neck were inflicted by someone scratching and could not have been caused by driving or riding a horse through underbrush.  The scratches ran in different directions and not just horizontally or parallel to the ground.  (*Id*. at 3282-3287).  The scratches were perhaps four hours old when they were photographed.  (*Id*. at 3290-3291).  Espinola also opined that Ingram's elbow injuries were not caused by falling off a horse or falling on a racquetball court, but rubbing against a hard object like a bed while having sex.  (*Id*. at 3294-3297).  Dr. Espinola said he thought Ingram had been in a fight. (*Id*. at 3299).  He said that the fingernails of the person who scratched Ingram would not necessarily show blood.  (*Id*. at 3300).

### C.      The Conviction, Sentencing, and State Habeas

The jury convicted Ingram of aggravated kidnaping.  The case was transferred back to Polk County for sentencing.  On September 12, 1991, the judge sentenced Ingram to a prison term of forty years.  *Ex parte Ingram,* Application No. 68,200-01 (Event ID: 2298919) at 367-369.  The Ninth District Court of Appeals affirmed on October 16, 1996.  *Ingram v. State*, No. 09-91-232-CR, 1996 WL 596013 (Tex. App. — Beaumont 1996, pet. ref'd) (not designated for publication).  On May 21,

1997, the Texas Court of Criminal Appeals refused Ingram's petition for discretionary review. PDR No. PD-0200-97.

On May 20, 1998, Ingram filed an application for a state writ of habeas corpus. *Ex parte Ingram*, Application No. 68,200-01 (Event ID: 2298919) at 1. On June 1, 1998, Ingram filed a "Motion to Abate Proceedings," asking the court to "hold the instant proceedings initiated by lawyer Dick De[G]uerin in abeyance" without dismissing the habeas application. *Id*. at 34-36. On June 3, 1998, a state trial judge issued an "Order Abating Proceedings and Scheduling Hearing," staying the deadlines and ordering a hearing. *Id*. at 37-38. The hearing was held on July 7, 1998. *Ex parte Ingram*, Application No. 68,200-01 (Event ID: 2305568) at 274-279. At the hearing, Ingram was allowed to make a brief statement in which he explained that "the writ needs to be expanded and have evidence presented to you so that you can make a reasonable decision on the merits of the case." *Id*. at 278. The judge granted Ingram's motion. *Id*. at 279.

On November 23, 2004, Ingram filed an "Amended and Supplemental" application for a state writ of habeas corpus. *Ex parte Ingram*, Application No. 68,200-01 (Event ID: 2298919) at 39-290. On February 2, 2005, Ingram filed a "Motion to Reinstate" his state writ application. *Id*. at 298-299. On March 15, 2005, the State responded, arguing that Ingram's claims were barred by laches and lacked merit. *Id*. at 300-34. The judge held hearings on April 22; May 20; June 29, 2005, and on August 16, 2006. *Ex parte Ingram*, Application No. 68,200-01 (Event ID: 2305568) at 281-410; (Event ID: 2305573) at 784-904, 909-960.

On June 12, 2006, Ingram filed his "Second Amended and Supplemental" state writ application. *Ex parte Ingram*, Application No. 68,200-01 (Event ID: 2298919) at 334-355. The final hearing was held on August 16, 2006. *Ex parte Ingram*, Application No. 68,200-01 (Event ID:

2305573) at 965-983.  On February 22, 2007, Ingram filed a *pro se* "Supplement" to his state writ application.  *Ex parte Ingram*, Application No. 68,200-01 (Event ID: 2298919) at 350-61.

### D.    The Evidence at the Four State Habeas Hearings

As noted, the state habeas court conducted four hearings on laches and the merits of Ingram's claims.  Ingram was represented by counsel, Stanley Schneider, at the hearings.

### 1.    The April 22, 2005 Hearing

Ingram called his trial and appellate counsel, Dick DeGuerin, as a witness.  *Ex parte Ingram*, Application No. 68,200-01 (Event ID: 2305568) at 281-410.  DeGuerin had filed the state habeas application alleging a *Brady* violation and sought discovery into the relationship between Smith and two men – Lynn Daughrity and Robert Dees – with whom she had previously had extramarital sex. When DeGuerin filed the habeas application, he had information that Ingram had discovered in documents that had been given to the judge for *in camera* review.  The judge had not required these documents to be produced to the defense.  The documents were notes, written by Barbara Dale Smith's worker's compensation lawyer, stating: "Two one-night stands," "Lynn Daughrity," and "Robert Dees."

Before and during the trial, DeGuerin had sought discovery into information about Smith's prior extramarital sexual encounters and about any history of violence between Smith and her husband.  DeGuerin pursued the theory that Smith had made up the rape charge to avoid telling her husband about her sexual encounter with Ingram.  Before trial, DeGuerin had tried to investigate Smith's relationship with her husband but found nothing to substantiate rumors of domestic violence.  DeGuerin testified that the prior affairs:

> explained the worst fact in the case; and that was why Barbara Dale
> Smith would have done such a dramatic act of running away from the

27

house without her clothes on.  And I think that it – it fit with what I thought had happened that she thought – she was afraid her husband was going to find out she had had this one-night stand with Ingram and was going to hurt her or do something to her.

*Ex parte Ingram*, Application No. 68,200-01 (Event ID: 2305568) at 302.

DeGuerin talked to Lynn Daughrity on April 26, 2000.  (*Id*. at 309).  Daughrity and Smith had one sexual encounter in January 1984.  Daughrity said that Smith told him that her husband had broken her arm after finding out.  DeGuerin's theory was that Smith feared her husband would find out that she had just had her third one-night stand.  (*Id*. at 315-316).  DeGuerin tried unsuccessfully for two years to get an affidavit signed by Lynn Daughrity.  He did obtain one from Robert Dees.  (*Id*. at 312).

On cross-examination, DeGuerin testified that the fact that Smith had two prior one-night stands was "completely contrary to the State's presentation of Barbara Dale Smith as a virtuous, innocent, naive, little country girl who had been taken advantage of by an evil doctor.  She told her lawyer that she had two previous one-night stands and even named the two people.  So I thought that was extremely relevant material, admissible, and that the rape shield law would prevent us – would not have prevented us from introducing that evidence."  (*Id*. at 321).  DeGuerin testified that the theory of the trial had been to show that she made a false rape allegation to explain why she was not at the hotel if her husband called.  On re-cross-examination, the following exchange took place:

> [State]    Given what the information states in the in-camera evidence, is it your testimony today that, given the rape shield laws and the fact that we can assume Judge Martin reviewed the material, he was aware of what was stated on the sheet about the paramours, he was aware of what you have seen and I have seen and Mr. Schneider has seen, is it your testimony today that he would have ignored rape shield laws and admitted that material?

28

[DeGuerin]      No.

(*Id*. at 357).  DeGuerin conceded that the trial judge would not have admitted the paper with the two

names and the words "two one-night stands."  (*Id*. at 360).

### 2.      The May 20, 2005 Hearing

Carol Lynn Daughrity, one of the two men named on the note, testified in the second state

habeas hearing.  *Ex parte Ingram*, Application No. 68,200-01 (Event ID: 2305573) at 1.  Daughrity

met Smith in January 1984 in a restaurant.  After a series of meetings in out of the way places, such

as parks, they had sex on one occasion.  *Id.* at 913.  A few days later, Daughrity received a phone

call from Smith's husband telling him to stay away from Smith.  The relationship ended in April

1984.  Several weeks later, Smith called Daughrity at work and apologized.  *Id.* at 915.  She said that

her husband had broken her arm when he found out about the relationship.  *Id.* at 916.  On cross-

examination, Daughrity testified that he never saw Smith's broken arm.

Smith testified for the State in the hearing.  She testified that in the course of her marriage,

she had two affairs.  *Id*. at 922.  The affair with Robert Dees was a one-night-stand at a convention

in New Orleans in 1983.  *Id.* at 922.  She and Daughrity had met about four times in 1984.  She told

her husband about both affairs.  Her husband was angry and called Daughrity on the telephone.  She

testified that her husband was not violent toward her, including after she told him about the affairs.

*Id.* at 924.  She denied that her husband had ever broken her arm.  Smith testified that she had told

Daughrity that her husband broke her arm so that Daughrity would leave her alone.  *Id*. at 939.

Smith testified that she told the prosecutor, Jan Krocker, about the affairs.

Smith's husband, Rowdy Smith, also testified.  He denied using violence toward his wife.

*Id*. at 945.  He testified that his wife never had a broken bone.   He said that he knew about his

29

wife's affair with Daughrity and told him to stay away from his wife.  On cross-examination, Rowdy Smith admitted that he had been angry when he learned about his wife's affair with Daughrity, but he denied grabbing or pushing her.  He denied that his wife was afraid of him.

### 3.      The June 29, 2005 Hearing

Jan Krocker testified that she was appointed as the prosecutor *pro tem* in November 1990. *Ex Parte Ingram*, Application No. 68,200-01 (Event ID: 2305573) at 797.  She could not recollect any preparation interview with Smith.  She observed that Rowdy Smith was extraordinarily supportive of his wife and saw no signs of domestic violence.  *Id.* at 797.  She explained that she investigated Smith's medical history back to 1973.  *Id.* at 798.  She found no evidence of a broken arm.

Krocker testified that it was her standard practice in a case involving medical evidence relating to sexual assault to investigate whether the complainant had had sexual relations around the time of the offense.  Krocker acknowledged that that could be *Brady* material with respect to the medical issues.  It was also her practice to ask whether or not the complainant had ever accused anyone else of sexual assault.  If a victim informed Krocker of past sexual experiences, then Krocker would investigate to determine whether that was *Brady* material.  *Id.* at 800.  If she had determined that information was not relevant under Rule 412 of the Texas Rules of Evidence and not *Brady* material, she would not have disclosed it.  *Id.* at 800.

Krocker did not consider Smith's two prior one-night sexual encounters to be relevant or *Brady* material.  The two prior affairs took place six years and nine years before the alleged assault by Ingram.  *Id.*  Unless Smith had accused either of these earlier partners of sexual assault, Krocker did not think *Brady* was implicated.  The encounters were far too remote and there were no

30

similarities with the encounter between Smith and Ingram.  *Id.* at 800.  To ensure that none of Smith's prior sexual history came into evidence, Krocker filed a motion in limine asking that DeGuerin approach the bench before he went into any prior sexual experiences of the victim. Krocker's motion was granted.  *Id.* at 802.  Krocker explained that "had Mr. DeGuerin been able to go into something like the two one-night sexual encounters that are mentioned in those records then there was a very good chance that Judge Martin would have allowed in some of the extraneous offenses that the State had to offer."  *Id.* at 806-07.  Neither Smith's prior extramarital sex nor Ingram's extraneous acts came into evidence.

The State had a large number of extraneous offenses to offer against Ingram.  The State provided notice of those offenses to Ingram.  The extraneous offenses included an indictment for aggravated kidnaping of a former patient in August 1988; an indictment for rape in 1973; two indictments for sexual assault (one in 1986); an indictment for assault by contact; and one other aggravated kidnaping charge.

Krocker responded to Ingram's argument that the prosecution made Smith's marital fidelity an issue by portraying her as "virtuous" through Dr. Hays's testimony.  Krocker explained:

> Hays was a defense witness.  And he was called after the State presented evidence from the therapist and, I guess, the psychiatrist who had treated Barbara Smith.  And Dr. Hays was called to review the test results that came about as a result of her treatment.  I think she had taken some tests then.  So he was actually – they are actually quoting here from a defense witness.  And the purpose of Dr. Hays' testimony – there were really several purposes.  One was to say Mrs. Smith did not have post-traumatic stress syndrome.  Another one was to say she was neurotic, and they linked that up to the hypochondriac stuff.  And the third one was to say that based on the MMPI that she was trying to show herself to be more virtuous than she really was. There were 15 questions on the MMPI that were related on that.  And they said on ten of those she had given an answer that indicated she was trying to present herself to be more virtuous.  So I was allowed

then to go into those questions on the test – Dr. Hays had called this
the L scale, the lie scale; and it's a standardized measure, he said, to
see if someone was presenting themselves as more virtuous than they
really were.  He said it was common for people that wanted to be
police officers and people going into the clergy and people who were
trying to get custody of their children to score high on that.  That is,
they were presenting themselves as being more virtuous than they
were.  And in 10 of the 15 he said her answers indicated that.  I went
through all 15 questions.  One of them, for example, was, "I would
try to get in to a movie theater without paying"; and Barbara had
answered false on that.  And they said that since most people would
answer true, they really would try to sneak into a movie theater
without paying, that indicated she was presenting herself as more
virtuous.  So I was allowed to ask, "Well, maybe she was just the
kind of person that wouldn't sneak into a movie theater, for
example."  So we went through all 15 questions like that, and it
turned out to be extraordinarily helpful to the State's case.

*Id.* at 812-14.

At the beginning of her rebuttal closing argument, Krocker stated:

For three and a half weeks we have watched Barbara Smith on trial
and I'm sick of it and you ought to be sick of it.  We have passed
around her underwear.  We have discussed her dermatitis.  We have
talked about whether or not she has ever – she is too virtuous.

(Reporter's Record, Vol. XX, pp. 3594-95).  Krocker explained that this was a reference to Dr.

Hays's testimony.  *Ex parte Ingram*, Application No. 68,200-01 (Event ID: 2305573) at 816.

Krocker reviewed the record and disputed that there was anything suggesting that Smith had

always been faithful to her husband:

Mr. DeGuerin had given an opening statement; and on final
argument, I went through and kind of challenged everything he had
said on opening statement.  And one of the things that he had referred
to on opening was that Dr. Ingram cooperated with the police.  And
I responded.  It starts, actually, on a previous page, probably 3538.
"What choice did he –" meaning Dr. Ingram "– have?  He knew the
doctor –"and that's referring to Dr. Perez or whatever doctor was
treating at the hospital, "– would see the redness.  The semen would
be his blood type.  He knew his only chance of getting away with this

was to claim Barbara was a liar or a person of loose morals.  His
freedom depended on telling a good story."  So that was my response
on final argument to Mr. DeGuerin's opening statement.

*Id.* at 830.

Krocker explained that she mentioned "virtuous" one or two times in her final argument to

respond to DeGuerin's argument.  She described the defense argument:

> He rode two horses in final argument.  One of them was based on all
> this testimony from Dr. Ingram's employees and Dr. Neumann that
> she was very flirtatious and, to use a colloquial term, she was on the
> make up in Livingston, Texas, was the implication.  Another was that
> perhaps she was so naive that she didn't realize how her flirtatious
> behavior was being viewed by Dr. Ingram.  And, in fact, there was a
> mistake of fact charge; and one of the things Mr. DeGuerin argued
> was that it was a mistake of fact that Dr. Ingram had thought she
> wanted this social outing and thought she perhaps wanted sex and
> that was a mistake of fact.

*Id.* at 832.

Krocker explained how she responded in her final argument:

> So this is my response to his riding those two horses, and it refers to
> Dr. Hays' testimony about the MMPI. It says, "What he called the lie
> scale could have been a scale that she is just a very virtuous, good
> person; and isn't that a novel defense?  The woman, there is nothing
> wrong with Barbara Smith.  There is no promiscuity.  So what is the
> defense?"  So I think that's the one place I mention "promiscuity",
> and I was referring back to the stuff from Dr. Neumann and his
> employees about what she had been doing on that day by her dress
> and her flirting and that sort of thing.  Then I go on to say, "The
> defense is so – she is so virtuous she must have broke –" it should
> have been "broken out leaving him home running down the road
> naked because she cheated on her husband for the first time."  And
> that was invited response by the defense's argument.

*Id.* at 832.

On cross-examination, Krocker testified:

> I would have talked to her enough to make sure it wasn't *Brady*. That
> was my standard procedure. I did it the same way in every case. If
> it had been — let me tell you. If it had been her habit; if, for example,
> she had been going out and consensually sleeping with people in the
> six months or the year or the two years before; if there was habit or
> routine or some reason it would be admissible and relevant. But, you
> know, probably 30 percent of the women in this country couldn't
> testify and prosecute in a rape case if they had to reveal who they had
> sex with six years before and nine years before. And that's exactly
> the reason that every state in America has enacted a rape shield law.

*Id.* at 859.

### 4.      The August 16, 2006 Hearing

Diane Bull testified that she was a prosecutor in Polk County in November 1989. *Ex parte*

*Ingram*, Application No. 68,200-01 (Event ID: 2305573) at 969. She interviewed Smith on the day

of the assault. Bull identified Defendant's Exhibit A as her notes taken during a telephone interview

with Smith. Bull could not recall when she took these notes. The note stated:

> 8 yrs ago at a convention in New Orl Robert Dees – also a sales rep,
> for Wallace Pharmacuetical [sic] kids very sick, no money,
> relationship  stressed – both husb. & wife depressed.
> 5 yrs ago – Lynn Daughrity, Needland Tx . . . chemist for Allied Pest
> Control. Met in restaurant – had lunch once a wk for couple of wks,
> Son had just had shunt put in – easy to talk to, had lot of
> conversation. One aft. in Beaumont. Soon as husband came in told
> him. Husband called Lynn & his wife. Lynn denied it. Told him cdnt
> see him anymore b/c husband beat her up. Didn't really – just an
> excuse. Only Janice knows. James got anon. call after this 'wife ran
> around on husband.' Very stressful time, debt collectors calling.
> Pharmacuetical [sic] Rep from McNeils sister company, Jim Bolton
> have known a long time – 8 yrs best friends, no affair, lunch together
> often – a lot of reps have commented and teased. Jim told Barb &
> husband that he's in love with Barb! But he's not going to leave his
> wife. Have kissed on cheek. Asked him not too. Never did anything
> out of line. Rowdy aware of all this.

*Id*. at 985-986.

Her notes were about three men, Lynn Daughrity, Robert Dees, and Jim Bolton. *Id.* at 970-71. The relationship between Smith and Bolton was platonic. The other two were extramarital affairs. In the interview with Bull, Smith reported that she had told Lynn Daughrity that her husband broke her arm. Smith explained that she used this excuse to terminate her relationship with Daughrity.

Bull left Polk County in April or June 1990. She talked to Krocker about the case before she left, including about her interview with Smith. Bull's last communication with DeGuerin was at the March 13, 1990 discovery hearing before the trial judge. Bull recalled that at the discovery hearing, DeGuerin asked for any evidence about domestic disturbances.

## E.  The State Habeas Ruling

On June 27, 2007, Judge Trapp issued findings of fact and conclusions of law and forwarded the application to the Texas Court of Criminal Appeals. *Ex parte Ingram*, Application No. 68,200-01 (Event ID: 2298919) at 362-67. The Court of Criminal Appeals remanded to the trial court on November 14, 2007, seeking further findings on the following issues:

> The trial court shall make further findings of fact as to whether there was evidence of the complainant's marital infidelities and her statement regarding being beaten by her husband that was not reviewed *in camera*, evidence that was either part of the State's case file or directly communicated to the attorney pro tem before trial. If there was such evidence in the State's case file or communicated to the attorney pro tem, the trial court shall determine whether the evidence was favorable and material to Applicant's guilt. *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Bagley*, 473 U.S. 667 (1985). The trial court shall also determine whether such evidence would have been admissible at trial. . . . The trial court shall also make any other findings of fact and conclusions of law that it deems relevant and appropriate to the disposition of Applicant's claims for habeas corpus relief.

*Ex parte Ingram*, Application No. 68,200-01 (Event ID: 2310736) at 2-3.

Ingram filed his "Memorandum In Response" on December 14, 2007. *Ex parte Ingram*, Application No. 68,200-01 (Event ID: 2321230) at 4-11.  On February 4, 2008, the State filed its "Proposed Findings of Facts and Conclusions of Law." *Id*. at 12-30.  The state habeas trial court forwarded both pleadings to the Texas Court of Criminal Appeals. *Id*. at 31.  On February 21, 2008, the state habeas trial court issued an order adopting the State's proposed findings of fact and conclusions of law.  *Ex parte Ingram*, Application No. 68,200-01 (Event ID: 2323360) at 2.  On September 10, 2008, the Texas Court of Criminal Appeals denied relief without a written order.  *Ex parte Ingram*, Application No. 68,200-01 (Event ID: 2298919) at cover.

**F.    The Federal Habeas Petition**

On November 10, 2008, this court received Ingram''s federal petition.  Ingram attacked the validity of his conviction on the following grounds:

(1)    The prosecutor, Jan Krocker, committed misconduct when she:

      a.    portrayed Smith as a virtuous person even though the prosecutor knew that she had had two prior affairs;

      b.    introduced evidence that Smith suffered from post-traumatic stress disorder; and

      c.    lied during closing argument.

(2)    The prosecutor suppressed exculpatory evidence.

(3)    The trial court erred when it prevented Ingram from confronting his accuser.

(4)    The prosecutor denied Ingram the right to present a defense by withholding favorable evidence.

(Docket Entry No. 1, Petition for Writ of Habeas Corpus, pp. 7-8).

Each ground is analyzed below.

## II.     The Claim of Prosecutorial Misconduct

### A.     Improper Argument (Ground 1A)

Ingram complains that the prosecutor, Krocker, intentionally painted a false picture for the jury of Smith's "virtuosity."  Krocker knew about the 1983 and 1984 one-night stands and the notes taken by the prior prosecutor, Bull.  Before trial, both Smith and her husband told Krocker about Smith's two prior affairs.  Ingram asserts that Krocker used the testimony of Dr. Ray Hays – a defense witness – to present Smith as a "virtuous" and truthful person.

To determine whether there has been prosecutorial misconduct, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)).  A trial is fundamentally unfair "if there is a reasonable probability that the verdict might have been different had the trial been properly conducted."  *Riddle v. Cockrell,* 288 F.3d 713, 720 (5th Cir. 2002) (internal quotation marks omitted).

DeGuerin posed the following questions to Dr. Hays on direct examination:

> Q     Now, let's get back to the validity scale. On the original, someone has circled the "L" score, which appears to be of all the scores on the entire test, the high score; is that a correct statement?
>
> A     Yes, that's a correct statement.
>
> Q     And that was circled on the original test?
>
> A     Yes, it was.  The "T" score and the "L" scale for Ms. Smith is 70, which is right at the pathological cut-off.  And what this indicates is that she's attempting to present herself in a very

virtuous light and attempting to show that – well, let me say it this way.  She's answered the questions in such a way which would indicate she sees herself as very conforming to all the rules of society and very virtuous and so on.

Q      And trying to present herself in that way?

A      That's correct.

Q      What is, what do you call the "L" scale?  What is that called?

A      That's called the "lie" scale.

Q      Lie?

A      Yes.

Q      Now, this is one of the scales that's built in to determine whether the person that takes the test is trying to maneuver the results?

A      That's correct.

Q      What can you conclude from that score on the lie scale?

A      The only conclusion that I reach from a lie scale when you have a "T" score of 70 is the individual may be attempting to show themselves in a better light than they in fact are.  That is, they may be deliberately downplaying any pathology that they've got and they may be attempting to show themselves as being very virtuous or very conforming to society's rules.

(Reporter's Record, Vol. XVII, pp. 2657-58).

DeGuerin continued his questioning of Dr. Hays:

Q      Now, regarding answering the questions in a way as to appear more virtuous or to manipulate the results, tell the jury, please, how the "L" scale tests that reaction.

A      The "L" scale is a scale which consists of 15 items and most of those 15 items are answered in a particular direction by most everybody.  Individuals who are honest about the way they believe they would conduct themselves in glancing at a

38

particular direction and in individuals who are trying to deliberately distort the profile, answer them in a socially conforming way.  That is not the way they actually are, but in a way they think others believe it should be answered.  There are certain sub-categories of individuals who answer them in the pathological direction and individuals, for example, who are applying for positions in the seminary, individuals who are trying to get jobs in police departments, individuals who are going through child custody cases have reason to answer in a socially conforming way.  That is the way they think people ought to answer the guestion[sic], not the way they really are.  So, they tend to have high scores on "L" scale.

Q      You mean the way they want people to think they are?

A      That's correct.

Q      Okay.

A      And they would have high scores on the "L" scale.  Most everybody in the general population has "L" scores in the average range.

Q      If they are not trying to manipulate the result?

A      That's correct.

Q      Give the jury, please, some specific examples of the questions asked of Barbara Dale Smith on the "L" scale and what her answers were and what the literature and the tests tell you the answers ought to be for most people.

A      Ms.  Smith  answered  the following question in the pathological direction.  Question 15, which is "Once in a while I think of things too bad to talk about."  She answered that "false."

Q      What does this test show that most people should answer that question?

A      Most people answer that question "true."  "Once in a while, I think of things too bad to talk about."

Q      All right.  What's the next question?

39

A    Question 30, "At times I feel like swearing." And she answered that one "false."  And most individuals in the general population answer that one "true."

Q    Next question?

A    Question 45, "I do not always tell the truth." She answered that one "false."  Most individuals, if they are honest in the way they respond to this question, answer that one "true." Question 90 was the next one, "Once in a while I put off until tomorrow what I ought to do today."  She answered that one "false." Question 120 was the next one.  "My table manners are not quite as good at home as when I'm out in company." She answered that one "false." Question 135, "If I could get into a movie without paying and be sure I was not seen, I would probably do it."  She answered that one "false." Question 165, "I like to know some important people because it makes me feel important."  She answer that one "false." Question 180, "I find it hard to make talk when I meet new people."  She answered that one "false." Question 210, "Everything tastes the same." She answered that one "false."

. . .

THE WITNESS:  "Everything tastes the same."  It's an unusual question.  And that's one that is hard to understand why it fits on this scale, but it's on the scale, and that's the way she answered it. Question 225 was the last one she answered, the ten questions that she answered on the scale.  She answered it "false," and the question is "I gossip a little at times."

(*Id.* at 2662-2665).

Krocker cross-examined Dr. Hays:

Q    Now, this first one that you called the lie scale.

A    Yes.

. . .

Q      That's some kind of a check in the test to make sure that people are not trying too hard to answer as if they're looking virtuous?

A      Yes.

Q      Are there only ten questions on the entire test that are designed to measure that or that are looked at to measure that?

A      No.  There are 15 items on the "L" scale.

Q      And you read us ten of those or some of those?

A      No.  I read you ten that she answered in order to get her score where it is at 70.

Q      And there were five of them that were not raising the score?

A      That's correct.

Q      Or you thought the answer was appropriate?

A      Well, it's not what I think is appropriate.  It's the way the test is scored.

Q      Okay.  What the test thinks is appropriate?

A      Yes.

• • •

Q      • • •  "Once in a while I think of things too bad to talk about."

A      Yes.

Q      Most people say "true"?

A      Yes.

Q      All right.  She said "false"?

A      Yes.

41

Q    "Once in a while I think of things too bad to talk about."
Now, if she was thinking of things too bad to talk about all
the time, wouldn't "false" be the correct answer?

A    Yes.

Q    And if she answered that truthfully, that wouldn't mean that
she was trying to trick anyone by showing she was more
virtuous than she is; would it?

A    That's true.

Q    It may be that she's really thinking of bad things all the time?

A    Could be.

Q    Okay.  What's the next one?

A    Next one is Item 30.

Q    That was not one you read before; is that correct?

A    No, it is one I read before.

Q    Which one is that?

A    It's item 30.   "At times I feel like swearing."  And she
answered that one "false."

Q    All right.  Now, of course, women swear less in our society
than men as a general proposition; is that true?

A    That's been my experience.

Q    Especially women who are raising children who may work
very hard at not swearing?

A    That's true.

Q    And if you would imagine a hypothetical that once, that a
woman who was raped, when she got back to her home town,
the first person she went to see was her Baptist minister,
would that not indicate that perhaps this is the kind of person
who feels that swearing is inappropriate?

42

A      No question about that.  And that's exactly the point of this particular item in this particular scale.

Q      So —

A      It doesn't ask whether you do, in fact, swear or not.  It asks whether you feel like it.

Q      Well, maybe she doesn't feel like swearing if she doesn't believe that's appropriate.

• • •

BY MS. KROCKER:

Q      Well, maybe she's just one of these people who doesn't feel the need to swear, or at least feel the need to swear very often.

A      Uh-huh.  You know that's somewhat inconsistent with my belief about what she thinks about Dr. Ingram.  She's real angry with him, and if there is, if she's – give me guidance here if I get too far afield here.  If she really were angry at him, she would want to do everything at him, including swear at him.  That would be my belief.

Q      In fact, the records reflect that what she wants to do is kill him; isn't that right?

A      That's true.

Q      In fact, she's talked numerous times about wanting to get a gun and go kill Dr. Ingram.

A      I understand that.

Q      And are you saying that just because she wants to kill him, that also means she wants to swear about him?

A      You know, if you wanted to kill somebody, I think swearing at them is a lot less hostile and a lot less permanent, and it's a good way of venting anger.

Q        But  maybe  not  if  you're a church-going every Sunday
         Baptist.

A        Well, you know, there is another –

• • •

BY MS. KROCKER:

Q        I can't remember what it was.  I'm just saying that her
         background, upbringing, her religious beliefs, it may be that
         just because she wants to kill the man who raped her, it
         doesn't mean she's thrown all of her religious beliefs out the
         window.

A        I understand that.

Q        Okay.  Is that possible?

A        Oh, absolutely.

Q        And, in fact, when you were talking about this is called the lie
         scale, it could also be called the "virtuous scale," couldn't it?

A        It absolutely could.

. . .

Q        Isn't it possible that people who are very virtuous are the kind
         of people who would be interested in going to the seminary?

A        That's true.

Q        And people who believe in rules and want to enforce them
         sometimes are the kind of people who want to go into police
         work.

A        That's true.

Q        And that maybe they are really telling the truth when they
         answer these questions.

A        That's true.

44

Q      Let's go on to the next one.

A      Item 45 is "I do not always tell the truth."  And she answered that one "false."

Q      And do you think it's not possible that maybe she does always tell the truth?

A      I haven't got an opinion about that one way or another, except it's very difficult for most people to tell the truth all the time.

Q      But there are some people who work real hard at it, aren't there?

A      Yes, there are.

Q      And you've never met Barbara Smith or had any business dealings with her?

A      That's correct.

Q      And as far as you know, she may well be very truthful.

A      I have no information about that. . . .

. . .

Q      What's the next question?

A      Next question is Item 75.  "I get angry sometimes."  And she answered that one "true."

Q      And is that correct?  How do you rate that answer?

A      Well, that's one of the items that, again, would be one of the five that she did not endorse.  And that's one, she could have gotten a "liar" score if she had answered that one in the other direction.

Q      When she says "I get angry sometimes," is that consistent with a rape victim?

A      Yes.  Consistent with most people.

45

Q      And if, indeed, she was angry, she could be trying to put the anger aside and get back to normal and get better. Would that be consistent with that answer?

A      Yes.

Q      What's the next one?

A      It's Item 90. "Once in a while I put off until tomorrow what I ought to do today." And she answered that one "false."

Q      Meaning she does today what she has to do, more or less?

A      Yes. She doesn't procrastinate.

Q      Well, if you had a working mother with three children, that, indeed, may be very consistent with the way she has to function, do you think?

A      Well, I don't know anybody that didn't put off once in a while things that they ought to do today.

Q      Well, don't some people try very hard to be organized and be efficient?

A      Yes.

Q      What's the next one?

. . .

A      The next question is, yes, 135. "If I could get into a movie without paying and be sure I was not seen, I would probably do it." And she answered that one "false."

Q      You mean to tell me that most people would go into a movie theater if they can get away with it? Most adults?

A      On a normal direction, there are a lot of people who would go into the movie theater without paying if they thought they can get away with it; yes, ma'am.

. . .

46

Q      Isn't that consistent with the other things that she said, that she didn't like to swear, for example, and that sort of thing and that she's trying to control other thinkers?  I mean, wouldn't the fact she wouldn't sneak into a movie theater kind of fit in with this total personality? "

A      Yes.

. . .

Q      Okay.  Let's go on to the next one, Item 225, the last one.

A      "I gossip a little at times."  And to which she answered "false."

Q      "I gossip a little at times."  That means, would be consistent with her not being much of a gossiper?

A      Yes.

Q      And that will be consistent with a person testifying during the trial that she wasn't particularly aware or involved in gossip in a small town.  Wouldn't that be consistent with that?

A      Would be consistent, but the question is absolute "I gossip a little at times," either "yes" or "no."

Q      And she said "no"?

A      Right.  That she doesn't gossip.

Q      Let's go on to the next one.

A      That's –

Q      That's it?

A      That's it.

(*Id.* at 2686-2704).

These excerpts show that the defense, in questioning Dr. Hays, initially argued that Smith was portraying herself as being very virtuous in her answers to the questions on the MMPI.  On

47

cross-examination, the prosecutor sought to refute that argument by asking if, in fact, Smith was answering the questions truthfully.  Dr. Hays conceded that Smith could have been answering truthfully.  Nothing in the prosecutor's questions show that she falsely tried to paint Smith as a "virtuous" person who had never committed a sexual impropriety.

The Fifth Circuit has identified circumstances in which cross-examination calls for rebuttal during redirect.  Such redirect is not error.  *See United States v. Jimenez,* 509 F.3d 682, 691 (5th Cir. 2007); *United States v. Acosta,* 475 F.3d 677, 683-84 (5th Cir. 2007); *United States v. Maldonado,* 472 F.3d 388, 398 (5th Cir. 2006).  Ingram is challenging evidence that came in through cross-examination of a defense witness.  Through that witness, Ingram tried to put in evidence that Smith had attempted to present herself in a falsely favorable light.  The State was entitled to elicit rebuttal evidence.  Ingram is not entitled to habeas relief on this claim.

### B.    The Claim that the Post-Traumatic Stress Disorder was Used to Excuse Inconsistent Statements

The State introduced the diagnosis of post-traumatic stress disorder through the testimony of Jane Flannigan, who testified that Smith exhibited PTSD symptoms,  including memory block. Ingram argues that the State used the diagnosis of post-traumatic stress disorder to excuse Smith's inconsistent statements.  Ingram lists the following inconsistent statements:

(1)    Ingram wanted to "make love," changed to "do this to you."

(2)    Ingram initially "went to sleep," became "passed out."

(3)    Smith denied hiring a civil attorney until confronted with her power-of-attorney form.

(4)    In Smith's initial evaluation in the emergency room, she stated that Ingram carried her to the bed.  Later, in an interview with the prosecutor, she did not remember how she got to the bed.  Over a year later, Smith was unable to give a detailed description of the "abduction" until the

48

prosecutor helped her reenact the events.  She then remembered Ingram had grabbed her by the shoulders and pushed her to the bedroom.

(5)    The "dinner date" became a "business dinner."

(6)    Smith first stated that she left a telephone message for her husband and told him she would be back at the motel at 10:00 p.m.  This later changed to 9:00 p.m.

Ingram points out that Dr. Hays testified that the psychological testing did not indicate PTSD.   Dr. Hays explained that the return of Smith's memory of the night at issue was "confabulation" from hysteria, embarrassment, denial or repression.  Ingram argues that under "relentless cross-examination," Krocker "forced" Dr. Hays to agree that Smith had PTSD and "forced" him to admit that the medical records fit the DSM categories for PTSD.  Ingram complains that Krocker used medical records to paint a false picture of Smith to Dr. Hays, who changed his testimony and agreed with the State that Smith did have PTSD.

At trial, DeGuerin questioned Dr. Hays about whether Smith's MMPI was consistent with post-traumatic stress disorder, as follows:

> Q     All right.  What is post traumatic stress disorder?
>
> . . .
>
> A     It's psychopathology.
>
> . . .
>
> Q     Okay.  . . . is this MMPI inconsistent with psycho – post traumatic stress disorder?
>
> A     Yes, sir.
>
> . . .

Q       Okay.  There is a psychological term for a person who is unable or unwilling to remember a sequence of events for a period of time and then suddenly remembers exactly the sequence of events that the person was previously unable to remember.  Is there a psychological term for that?

A       Yes, there is.

Q       What is that psychological term?

A       The psychological term for remembering events that you have forgotten for some period of time is called confabulation.

. . .

Q       Assume that for about a year's period of time that person said she was unable to remember how she got from the dinner table to the bed and told several different versions of it. Assume further that while at a Burger King with two prosecutors attempting a reenactment, that person suddenly said that she remembered exactly how she got from the kitchen table to the bedroom. Assuming those facts, is that an example or could that be an example of confabulation?

A       Yes, it could.

. . .

Q       Can hysteria cause the sort of memory lapse or lack of memory and then later filling in?

A       It could.

Q       What about embarrassment?

A       Yes, it could.

Q       And what about repression?

A       Yes.  The psychological term for this type of forgetting are denial and repression.  And they are also factors that you can attribute such memory lapses to.

Q    You mentioned denial along with repression.  Explain that to the jury, please.

A    Well, denial is – the most common type of denial that we have in our society is denial of alcoholics.  When we see that, it's on advertising for the hospitals where an individual comes on television and says, "Yes, I've lost my job and, yes, I've lost my car and, yes, I've lost my family, but I'm not an alcoholic.  I don't have a drinking problem."  That's called denial; and we can sit there and analyze the problems that they've got from the alcohol and then say, "but it's not a problem."  That's the classic example of denial.  We all have various kinds of denial, but that's just one example.

(Reporter's Record, Vol. XVII, pp. 2660-2662, 2665-2674).

On cross-examination, Dr. Hays testified that he reviewed the Diagnostic and Statistical Manual – DSM3R – the current reference book for diagnoses of various mental illnesses.  He explained that to be diagnosed as having post-traumatic stress disorder, the individual must meet certain criteria in each of five areas.  (*Id*. at 2710).  At trial, Krocker created a chart listing the five areas and the criteria.

The defense had called Dr. Hays to refute the evidence that Smith suffered from PTSD.  On cross-examination, the prosecutor painstakingly went through the medical records with Dr. Hays to show that Smith's symptoms satisfied the criteria for PTSD.  When DeGuerin objected, Dr. Hays was allowed to review the records that had not been introduced into evidence.  After reviewing those records, he concluded that Smith had suffered from PTSD.  Dr. Hays agreed that the medical records had many references to Smith's symptoms that fit into the PTSD criteria.  After reviewing the reports and the records, Dr. Hays agreed that Smith was properly diagnosed with post-traumatic stress disorder.  (*Id*. at 2803).  Ingram cannot claim surprise or unfairness, given that Dr. Hays was a defense witness.  *See Buck v. Thaler*, 2009 WL 3054056 (5th Cir. 2009).

Ingram submitted an affidavit by Dr. Hays in which he recanted his trial testimony on Smith's diagnosis of PTSD.  Dr. Hays reviewed his trial testimony in light of Bull's notes of her telephone interview with Smith.  Dr. Hays's affidavit stated as follows:

> 1.  In this case my testimony as an expert witness concerned the psychological makeup of the complaining witness.  I believe that the any information concerning her relationships with her friends, her husband, and others at work and in her personal life would have been relevant in order to present a more complete picture of her.  The new information discovered in the State's file would have assisted the jury in making a decision about how to evaluate her testimony regarding how she remembered the events surrounding her encounter with the Applicant.

> 2.  The State portrayed Barbara Dale Smith as having a post-traumatic stress disorder.  This evidence was offered through the testimony of Jane Flannigan, a "certified employee assistance professional," who did graduate work for a psychiatric department of a Veterans Hospital and once researched the disorder for another employee.  I testified that post traumatic stress disorder was not evident in any of the psychological testing conducted by Dr. Roberts or noted in the records made by the treating psychiatrist.  The relationships noted in the suppressed notes indicate the normal kinds of activities that someone in a sales type job often has.  Based on the new evidence discovered in the State's file, Smith did not appear to me to be a virtuous, naive, or a sheltered person who might be susceptible to symptoms of a post-traumatic stress syndrome or who might suffer from traumatic amnesia (forgetting the events of the evening in question and suddenly remembering them when questioned by detectives some time after the event).

> 3.  I also feel that any intense friendships with males other than her husband or with whom she had a sexual relationship would indicate that she was not naive about such adult relationships.  This would also suggest that she would be able to read social cues more readily than she had been portrayed by the State.

> 4.  It is my opinion that the psychological testing of the complaining witness would have been interpreted differently in light of her background.  It is my opinion that given the adult male relationships that the complaining witness had and which were not available to the defense, there was apparently more distortion in her portrayal of

52

> herself as conforming to the highest standards of society and not
> being able to understand the social cues that were evident in her
> interactions with Ingram.
>
> I believe that the trial prosecutor intentionally distorted the
> "psychological evidence" presented to the jury in order to bolster
> Barbara Dale Smith's testimony by intentionally omitting the
> information contained on the two pages of notes in the prosecutor's
> file because the complainant omitted that information from all of her
> doctors and persons who evaluated her for workman's compensation.
> The new information discovered in the State's file supported the
> defense theory of the case and impeached a large part of the State's
> case and the complainant in particular.   The new information
> discovered in the State's file would have supported my opinion of her
> psychological profile rather than the person that the State presented
> at trial.

(Docket Entry No. 8, Petitioner's Memorandum, Ex. IV, pp. 2-3).

Dr. Hays's opinion at trial was based on his own review of Smith's extensive medical
records from 1973 to 1989.  He testified that, based on his review of those records, Smith satisfied
the criteria for being diagnosed with PTSD.  Recanting affidavits are properly viewed with extreme
suspicion.  *Spence v. Johnson,* 80 F.3d 989, 1003 (5th Cir. 1996).  In his affidavit, Dr. Hays states
that because Smith had "intense" or sexual relationships with men not her husband, she was not that
"virtuous, naive, or a sheltered person" and therefore would not have been "susceptible" to
symptoms of PTSD.  Whether Smith was a type of person "susceptible" to PTSD is irrelevant.  At
trial, Dr. Hays testified that Smith's medical records were consistent with a diagnosis of PTSD.  The
affidavit is no evidence of prosecutorial misconduct.  Dr. Hays's affidavit comes close to stating that
Smith invited rape by "social cues" she gave Ingram.  Ingram is not entitled to habeas relief on this
claim.

C.    The Improper Closing Argument Claim

Ingram argues that during closing arguments, the prosecutor sought to convince the jury of Smith's virtuosity and, by implication, her honesty.  Ingram asserts that the prosecutor made nine references to Smith's virtuosity, faithfulness, and happy family life.  Ingram points to Dr. Neuman's portrayal of Smith as someone using her sexuality to sell medical products.  Ingram asserts that the prosecutor responded by calling Dr. Neuman a liar, based on the picture of Smith as virtuous.  (Docket Entry No. 1, Petition for a Writ of Habeas Corpus, pp. 10-11).  Ingram argues that the prosecutor's statements during closing arguments were improper and prejudicial.

Krocker made the following statement during her closing argument:

> [DeGuerin] asked why we didn't bring in more psychiatrists.  Well, you heard a lady who came all the way from Pennsylvania from Barbara's company, a lady who knew a whole lot about post traumatic stress syndrome to tell you what was wrong with her. And quite frankly, there isn't a need to bring in another psychiatrist because the defense psychiatrist became a State's witness, didn't he?  He sat up there and he, he looked at those test results and he said there is no evidence of malingering, no evidence she's faking for a civil suit.  What he called the lie scale, he said could have been a scale that she is just a very virtuous, good person, and isn't this a novel defense?  The woman, there is nothing wrong with Barbara Smith.  There is no promiscuity, so what is the defense?  The defense is so she's so virtuous she must have broke out because she cheated on her husband for the first time.  He is accusing her of being on the make.  He is accusing her of being unfaithful to her husband.  And it is not true.

(Reporter's Record, Vol. XX, pp. 3599-3600).  Krocker explained during state habeas proceedings that she was referring to Dr. Neuman's testimony that Smith was a flirt and to DeGuerin's final argument.  *Ex Part Ingram*, Application No. 68,200-01 (Event ID: 2305573) at 832, 880.

Where a defendant claims a miscarriage of justice due to prosecutorial misconduct, a court's analysis consists of two steps.  The first is assessing whether the prosecutor made an improper

remark. The second is assessing whether the defendant was prejudiced. *United States v. Stephens*, 571 F.3d 401, 408 (5th Cir. 2009) (quoting *United States v. Fields*, 483 F.3d 313, 358 (5th Cir. 2007)). If the prosecutor made an improper remark, the court considers three factors in determining whether prejudice resulted: "(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction." *United States v. Hernandez-Guevara*, 162 F.3d 863, 874 (5th Cir. 1998).

When the challenged remarks are part of the prosecutor's closing statement, "if the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction." *United States v. Young*, 470 U.S. 1, 12-13 (1985); *see, e.g., United States v. Ramirez-Velasquez*, 322 F.3d 868, 874 (5th Cir. 2003) ("The prosecutor's response will not necessarily warrant reversal, so long as it is designed merely to right the scale." (internal quotation marks omitted)); *United States v. Vaccaro*, 115 F.3d 1211, 1216 (5th Cir. 1997) ("[W]e may consider the invitation in judging whether the prosecutor's invited response unfairly prejudiced the defendants." (internal quotation marks omitted)); *United States v. Tullos*, 868 F.2d 689, 697 (5th Cir. 1989) ("The defendant's comments clearly invited the prosecutor's reply.").

In her closing argument, Krocker first explained the charge and the meaning of reasonable doubt. She identified the elements of the offense of aggravated kidnaping. She reviewed the evidence showing that Ingram had inflicted bodily injury, terrorized Smith, and violated her sexually. Krocker then explained if the jury found Ingram not guilty of aggravated kidnaping, they should consider the lesser offenses of kidnaping and false imprisonment. Krocker then responded to the following points from DeGuerin's opening statement:

(1)     DeGuerin stated that there was no sign of an assault.  Krocker responded that the evidence showed the bedroom was a crime scene.

(2)     DeGuerin stated that Ingram cooperated with law enforcement.  Krocker responded that Ingram did not have a choice and that the only chance he had was to claim that Smith was a liar or a person of loose morals.

(3)     DeGuerin stated that doctors would testify about how Smith used her sex appeal to sell her products.  Krocker responded that Dr. Raymond Neuman was not credible because he was willing to lie for Ingram, and that Ingram lied about Smith because he had to portray her as a woman who wanted to be with him in order to be found not guilty.

(4)     DeGuerin stated that Smith had a low IQ.  Krocker argued that this did not give Ingram a right to hold her prisoner and rape her.

(5)     DeGuerin stated that Smith had suffered from depression before the incident.  Krocker responded that the evidence showed how Smith had suffered after the incident.

(6)     DeGuerin stated that Smith was on antidepressant drugs.  Krocker responded that Smith was not on drugs when the offense occurred.  Smith had not had a prescription for antidepressants since 1987, and then only for ten days.

(7)     DeGuerin implied that Smith refused to get better because she enjoyed being a victim.  Krocker responded that Smith did not seek pity.  Instead, she wanted to come to court.

In the rebuttal portion of the closing argument, the prosecutor began by saying that the trial had taken three and a half weeks and the jury had heard about many very personal aspects of Smith's life, including whether she was "too virtuous."  Krocker argued that the defense had tried to put Smith on trial to divert attention from Ingram.  Krocker responded to the defense argument that Smith ran naked from Ingram's house because she had cheated on her husband and was afraid of his reaction.  Krocker argued that this argument was, in effect, accusing Smith of being unfaithful to her husband.  Krocker responded that Smith had not been unfaithful to her husband because she did not consent to have sex with Ingram.  Krocker argued that Smith did not run out of Ingram's house naked in the middle of the night because she felt "guilty" over an extramarital one-night stand.

Krocker also pointed out the parts of Smith's testimony that were corroborated.  Krocker pointed out that Smith's wedding ring was missing a diamond and that she was not wearing it because the prongs were sharp; she tried to leave a message for her husband from the hotel; her watch was buried in the trash can; and the Bible was found on the road.  Krocker argued that the kidnaping and rape could not be corroborated by others because Ingram had made sure that no witnesses were present.  Krocker also argued that Smith's testimony was consistent with the medical evidence.  The doctor who examined Smith found that her injuries were consistent with sexual assault.  Krocker pointed out inconsistencies in Ingram's testimony about the injury under his eye; whether he had oral sex with Smith; how he took off Smith's dress; when pharmaceutical representatives were expected; and whether he called Smith about picking up Chinese food.

Krocker testified during the state habeas proceedings that she was responding to the defense theory that Smith had been flirtatious and consented to sex with Ingram.  The defense presented testimony showing that Smith deliberately came to Ingram's office late in the day; she previously

agreed to have dinner with Ingram when she was in town; she knew Ingram was divorced; she bought a "provocative" dress for the dinner; and she agreed to have dinner at his house. Krocker responded that there was no evidence that Smith willingly and repeatedly engaged in violent sexual intercourse with Ingram.

Krocker's closing argument presents no basis for habeas relief. Krocker's arguments did not focus on Smith's "fidelity" to her husband. Krocker mentioned "virtue" and "promiscuity" in response to the defense arguments. As noted at the state habeas proceedings, Krocker's closing argument consisted of fifty pages of transcript, and she mentioned "promiscuity" once. DeGuerin's comments during his opening and closing argument invited responses to the argument that Smith had invited the sex and ran naked and screaming to seek help in the middle of the night because she was worried her husband had tried to reach her at the hotel.

Finally, any prejudice from the prosecutor's comments during closing argument, when viewed in the context of the entire trial, is far outweighed by other factors. These counterweights include the weight of the evidence and the jury instructions. The prosecutor's statement did not cast serious doubt on the correctness of the jury verdict. *United States v. Gracia*, 522 F.3d 597, 603 (5th Cir. 2008). The state court did not unreasonably apply clearly established federal law when it denied habeas relief on this prosecutorial misconduct claim. Ingram is not entitled to federal habeas corpus relief on this claim.

## III.    The Claim of Prosecutorial Misconduct Based on Failure to Disclose Favorable Evidence (Ground 2)

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting

*Brady v. Maryland*, 373 U.S. 83, 87 (1963)).   The Supreme Court has consistently held the prosecution's duty to disclose evidence material to either guilt or punishment applies even when there has been no request by the accused.  *Banks v. Dretke*, 540 U.S. at 690 (quoting *Strickler v. Greene*, 527 U.S. 263, 280 (1999)); *United States v. Agurs*, 427 U.S. 97 (1976).  This duty applies to exculpatory and impeachment evidence.  *Strickler v. Greene*, 527 U.S. at 280; *United States v. Bagley*, 473 U.S. 667, 676 (1985).

Undisclosed evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  *Wood v. Bartholomew*, 516 U.S. 1, 5 (1995).  A reasonable probability of a different result is shown when nondisclosure puts the case in a different light so as to undermine confidence in the jury verdict. *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995).  "[I]nadmissible evidence may be material under *Brady*." *Spence v. Johnson*, 80 F.3d 989, 1005 n.14 (5th Cir. 1996).  The key is "whether the disclosure of the evidence would have created a reasonable probability that the result of the proceeding would have been different."  *Felder v. Johnson*, 180 F.3d 206, 212 (5th Cir. 1999).

Ingram complains that the prosecutor failed to disclose Bull's notes showing that Smith had had two prior extramarital affairs, one eight years ago with Dees and one five years ago with Daughrity, and that Smith had told Daughrity that she couldn't see him anymore because her husband had beaten her.  Ingram argues that the two most important elements of the kidnaping charge centered on Smith's consent to go to his home and how she got from the kitchen to the bedroom.  Ingram argues that the undisclosed notes showed that Smith falsely claimed that she had been raped because she feared her husband.  Ingram also argues that the notes show parallels between Smith's relationship with Lynn Daughrity and with Ingram.  The notes showed that Smith

was willing to go to out-of-the-way places with someone who was sympathetic.  The notes showed that Smith blamed Lynn Daughrity for the affair and remembered the relationship in such a way as to preserve her virtuous image.  Ingram argues that the affairs with Dees and Daughrity showed that Smith had an "aggressive" sexual nature.  Ingram argues that Smith was the predator and actively pursued Dees, Daughrity, and then himself.  The notes showed relationships supporting the defense theory that Smith either consented to going to Ingram's house for sex or gave Ingram that impression.

At the state habeas hearing, Smith testified that she had had two brief affairs during her marriage.  *Ex parte Ingram*, Application No. 68,200-01 (Event ID: 2305573) at 922.  She described her affair with Robert Dees as a one-night stand at a convention in New Orleans.  *Id.* at 922.  She testified that she met Daughrity about four times and had one sexual encounter with him.  She told her husband about both affairs.  Her husband called Daughrity because he was angry.  Smith stated that her husband had never been violent toward her and had never broken her arm.  She told Daughrity that her husband broke her arm so that Daughrity would stop bothering her.  *Id*. at 939.  Smith told Krocker about both affairs.

Diane Bull testified that she wrote the notes shortly before leaving the Polk County District Attorney's Office.  *Ex parte Ingram*, Application No. 68,200-01 (Event ID: 2305573) at 973, 975-976.  In a discovery hearing held on March 13, 1990, DeGuerin sought information about Smith's relationship with her husband.  The following exchange occurred:

> THE COURT:  All right.  I have a copy [sic]records.  I'm going to mark that in camera.  Copies of Mrs. Hope's telephone records.
>
> MR. DEGUERIN:  It should be – there are certainly no privileges on that.  Paragraph 0, that's reports which should be public records of disturbance calls to the complainant's residence and by – I have some

information that there have been a number of disturbance calls to her residence in Vidor. It's material on her relationship with her husband which we believe is the whole basis for this charge. She's, without revealing too much of what our defense is –

THE COURT: Do you have anything like this?

MS. [BULL]: No, sir. I don't have anything like that. And I disagree. Even if she and her husband were fighting like cats and dogs, you know, a rape is still a rape and no still means no. I don't see what possibly that is going to prove on the elements of rape. I don't think he's entitled to that. I mean, he's just left this open-ended. It could be in last year, the last five years, last ten years. How could that possibly be relevant to this case?

MR. DEGUERIN: We will limit it to the past year.

MS. [BULL]: I would still object to that.

MR. DEGUERIN: Without being specific about this case, Your Honor, I have participated in a case where a woman, after having an affair, a brief affair which her husband found out, because of fear of her husband then claimed that it was rape rather than consensual intercourse because she was afraid of being beat up by her husband. I think the relationship is important and the records from the Vidor Police Department, Orange County Sheriff's Office of disturbance calls may be material and certainly may lead to material evidence. It's up to Your Honor at the time of trial or perhaps before to determine whether I'm entitled to introduce that evidence. In fact, there are certain instances that are called rape shield law and we are not entitled without prior ruling of the Court to, just blurt out something about the previous sexual habits, for instance. But if we have that information, then we are entitled to bring it to court and ask the Court whether we can bring that to the jury's attention. But I have to get the information first. . . .

MS. [BULL]: Well, Judge, I don't think he's entitled to that, and the discovery Rule 1314 clearly requires the defendant to show good cause for that. He can't go on a fishing expedition because it might turn up something. . . .

MR. DEGUERIN: This isn't a fishing expedition.

THE COURT: What I hear you saying is you don't have them.

61

MS. [BULL]:  No, sir, I don't.

THE COURT:  This is a matter of defendant's discovery.  He has a subpoena out for them now, I assume; and so are you going to file a Motion to Quash?

MS. [BULL]:  Yes, sir.  There is not a subpoena file in this county that I'm aware of unless there was just filed.

MR. DEGUERIN:  It may not have been filed yet, Judge.  We will see.  It was supposed to have been.  If not yet, there will be.

MS. [BULL]:  I most likely will file a Motion to Quash because I don't think that's material or relevant and I don't think that should be turned over to the defendant.

MR. DEGUERIN:  Let's take the situation that if the State had in its records, in its file information that on three previous cases the police had been called to this lady's house because her husband had beat her up and accusing her of having affairs, it would be your duty to turn over that information to me under *Brady versus Maryland* because it certainly is relevant.  Whether it's admissible or not would be something that the Court could rule on, but I'd be entitled to that information.  And what I'm asking at this point is that the State not interfere with my investigation.

. . .

MS. [BULL]:  If the defendant does subpoena those documents to court on a particular days, I'd ask that the Court view them in camera first.

THE COURT:  Oh, yeah.

MS. [BULL]:  Before turning them over.

THE COURT:  I will.

MS. [BULL]:  Thank you.

MR. DEGUERIN:  The ruling, Judge, is if they have any of that in their file –

THE COURT:  If you have any of that information in the file, you will submit it to the Court.

MS [BULL]:  I don't have anything like that, I don't think.

MR. DEGUERIN:  That would be a continuing duty.

THE COURT:  Right.

(Reporter's Record, Vol. III, pp. 36-41).

At the state habeas hearing, Krocker, the prosecutor who took the case after Bull left, testified that Smith's husband was very supportive throughout the trial and she observed no signs of domestic violence.  *Ex parte Ingram*, Application No. 68,200-01 (Event ID: 2305573) at 797. Krocker explained that she reviewed Smith's medical records dating back to 1973 and found no evidence of a broken arm.  *Id.* at 798.  Krocker did not consider the two one-night stands to be *Brady* material because both were long before the assault at issue, and Smith had not accused anyone else of sexual assault.  *Id.* at 800.

To ensure that none of Smith's prior sexual history came into evidence, Krocker filed a motion in limine asking that DeGuerin approach the bench before he would go into any prior sexual experiences of the victim.  Her motion was granted.  *Id.* at 802.

At the state habeas hearing, Krocker explained that Ingram's extraneous offenses played a significant role in her trial strategy.  "[H]ad Mr. DeGuerin been able to go into something like the two one-night sexual encounters that are mentioned in those records then there was a very good chance that Judge Martin would have allowed in some of the extraneous offenses that the State had to offer."  *Id.* at 806-07.  Evidence of Smith's sexual history would have opened the door as to Ingram's numerous extraneous offenses, which included prior sexual assaults.  *Id.* at 810.

The state habeas court found:

63

C4.  The Court finds that Lynn Daughrity's testimony regarding Mrs. Smith['s] claim that her husband had broken her arm is not a "material" issue.  Consequently, it does not invoke the balancing test for admissibility.  Applicant seeks to impose an additional duty on every prosecutor.  If Applicant's relief is granted, the outcome is tantamount to saying that every prior sexual encounter of a victim is inherently *Brady* material.  Again, this is an absurd result.

F7.  Applicant confuses what constitutes *Brady* material with a victim's prior sexual history.  During the course of the trial Dick DeGuerin never requested an in camera hearing.  He never sought to question Barbara Smith out of the presence of the jury of the jury[sic] regarding any prior sexual history.  In addition, he never sought to take Barbara Smith on voir dire regarding any allegation of family violence.  In truth, during the course of the trial Dick Deguerin never attempted to develop any theory of family violence—not even out of the presence of the jury.

. . .

F38.  At the time Applicant was charged with aggravated kidnapping, he was facing several other charges.

F39.  The Polk County Grand Jury indicted Applicant during the January 1991 term for the aggravated kidnapping of Carol Hunter, a former patient, alleged to have happened on or about August 6, 1988.  CR Vol. 1 p.14.

F40.  Applicant was also facing aggravated perjury charges involving the aggravated kidnapping of Mrs. Smith.  In Cause No. 12,613 the State alleged Applicant perjured himself before the Grand Jury when he testified he had never before been accused of any sort of sexual misconduct in any place other than Texas.  While attending school in Alabama, Dr. Ingram was accused of rape by Jennifer Ann French on June 27, 1973, in Jefferson County, Alabama.   Dr. Ingram was arrested and indicted for the rape of Jennifer Ann French.  CR Vol. 1 pp.15-16.

F41.  The State of Texas also charged Ingram with the sexual assault of Teresa Sipult in Cause No. 12,630, alleged to have occurred on or about December 17, 1986.  CR Vol. 1 p.47.

F42.  An indictment was prepared for a Harris County Grand Jury on April 18,1991, involving the aggravated kidnapping of Susan Barry,

alleged to have occurred on or about March 1, 1988.  CR Vol. 1 p. 48.

F43.   The State provided notice pursuant to Rule 404(b) of other crimes, wrongs, bad acts it might introduce in its case in chief on April 22, 1991.  CR Vol. 1 pp.38-40.   The notice included seven specific instances:

1.  Rape of Jennifer French in 1973;
2.  Sexual assault of Janet Moyers in 1991;
3.  Sexual assault of Teresa Sipult;
4.  Assault by contact of Jeannie Herman;
5.  Aggravated kidnapping of Susan Barry;
6.  Aggravated kidnapping of Carol Hunter;
7.  Aggravated perjury committed by William Ingram.

F44.   In response to the 404(b) notice Dick Deguerin filed "Defendant William Ingram's Further Motion for Discovery."  It sought more information regarding the extraneous offenses concerning Carol Hunter, the rape of Jennifer French, the sexual assaults of Janet Moyers and Teresa Sipult, the assault of Jeannie Herman and the aggravated kidnapping of Susan Barry.  CR Vol. 1 pp.53-60.

F45.   The admission of Applicant's extraneous offenses an[sic] evidence of his other crimes, wrongs, and/or bad acts played an important role in the State's trial strategy especially if evidence of Mrs. Smith's prior affairs had been admissible.  As explained by Mrs. Krocker: "They were very important in trial because had Mr. Deguerin been able to go into something like to the two one night sexual encounters that are mentioned in those records. . . Then there was a very good chance that Judge Martin would have allowed in some of the extraneous offenses that the State had to offer.  RR Writ Vol. 6 pp.25-26.

F46.   In other words, the admission of the two prior sexual encounters of Mrs. Smith would have been more harmful to the Defense than helpful because it would have opened the door to Applicant's extraneous offenses and more importantly evidence of his other crimes, wrongs or bad acts.  The Defense could not afford for the jury to be exposed to this information at trial.

[C14.]  The Court finds that if Dick Deguerin had asked to question the witness outside the presence of the jury, and the Judge had ruled

> the prior sexual history admissible, it is more likely than not that Dr.
> Ingram's extraneous offenses and evidence of his other crimes,
> wrongs and bad acts would have come into evidence.  That was a risk
> Mr. Deguerin could not afford to take.  This was his trial strategy.

*Ex parte Ingram*, Application No. 68,200-01 (Event ID: 2321230) at 14-15, 23-25.

Under Rule 412(b) of the Texas Rules of Evidence, in a prosecution for aggravated sexual assault, evidence of specific instances of an alleged victim's past sexual behavior is not admissible unless it is evidence: 1) that is necessary to rebut or explain scientific or medical evidence offered by the State; 2) of past sexual behavior with the accused and is offered as evidence of consent; 3) that relates to the motive or bias of the alleged victim; 4) of a prior conviction that is admissible as impeachment evidence; or 5) that is constitutionally required to be admitted.  The probative value of this evidence must outweigh the danger of unfair prejudice.  *See* TEX. R. EVID. 412(b)(2) & (3).

In this case, evidence about Smith's prior extramarital sexual relationship was not necessary to rebut scientific or medical evidence.  Such evidence did not involve past sexual behavior with Ingram.  Ingram has not shown that the evidence was constitutionally required to be admitted.  Ingram argues that the evidence would show bias, that Smith alleged rape because she feared her husband would be angry upon discovering her affair with Ingram.  Evidence of a motive or bias is admissible only if the probative value outweighs its prejudicial effect.  The two prior extramarital affairs took place years before the alleged rape by Ingram in November 1989.  Smith never accused either man of raping her.  There is no basis to argue that the evidence would have been admissible.

Ingram's argument that notes show parallels between Smith's prior relationships and her relationship with himself is not supported by the record.  Smith admitted the two one-night stands were consensual.  She did not accuse either man of rape.  There was no parallel to her encounter with Ingram.

66

Ingram also claims that Smith "sought out" relationships with men in out-of-the-way locations.  Smith's encounter with Ingram took place at his home because he took her there, although she accepted an invitation to dinner at a restaurant.  Again, there is no parallel to the encounter with  Ingram.

Ingram argues that evidence that Smith told Daughrity that her husband broke her arm is material.  Ingram argues that Smith's lie to Daughrity about her broken arm contradicts the State's claim that she was a "virtuous" and "truthful" person.  At the state habeas proceedings, Smith testified that her husband never broke her arm and that she used the broken arm as an excuse to end her relationship with Daughrity.  James Smith, Smith's husband, testified that he never broke his wife's arm.  The medical records showed no broken arm.[2]  Ingram has not shown that the probative value of information about Smith's sexual encounters, six and nine years before the assault by Ingram, outweighs its prejudicial effect.

In *Wood v. Bartholomew,* 516 U.S. 1 (1995), the Supreme Court considered whether the failure to disclose inadmissible evidence constituted a *Brady* violation.  The Court concluded that speculation about the effect of evidence inadmissible under state law – polygraph results – was insufficient to show a *Brady* violation.  "It is difficult to see, then, on what basis . . . respondent's counsel would have prepared in a different manner, or (more important) would have discovered some unspecified additional evidence, merely by disclosure of polygraph results . . . In short, it is

---

[2]    DeGuerin chose not to ask Smith about the evidence he had that she and her husband were treated for a sexually transmitted disease in 1984.  This may have been motivated by his trial strategy of preventing the introduction of Ingram's extraneous offenses.  Krocker testified, and the state habeas court found, that had Ingram delved into Smith's sexual past, Krocker would most likely have been allowed to question  Ingram about his lengthy criminal history involving other sexual offenses.

not 'reasonably likely' that disclosure of the polygraph results – inadmissible under state law – would have resulted in a different outcome at trial. . ." *Wood,* 516 U.S. at 6-8.

In the present case, it is not "reasonably likely" that disclosure of the prior two affairs – inadmissible under state law – would have affected the outcome. The case against Ingram was overwhelming. To acquit Ingram of aggravated kidnaping, the jury would have had to believe that Smith agreed to have rough sex with Ingram; that she did not run naked to Ingram's neighbor in the middle of the night screaming that she had been raped; pretended to be hysterical; that she did not submit to intrusive medical examinations; and did not sustain physical injuries consistent with violent, prolonged repeated intercourse. The jury would have had to believe that Ingram scratched his face and upper body by riding a four-wheeler, playing racquetball, or falling off a horse. The jury would also have had to believe that Smith and Ingram only had sex twice; he got on his four-wheeler to find Smith so he could give her a ride to her hotel; and he placed Smith's dress and bra on the edge of the trash can as he looked for his car keys. Whether Smith lied about why she broke off her affair with Daughrity is not relevant to whether she was kidnapped and raped by Ingram years later. There was overwhelming evidence to support Ingram's conviction. As described in the detailed summary of the trial testimony, the jury saw the photographs of Ingram's injuries, the bed sheet with the blood and semen stains, and Smith's medical condition. The undisclosed evidence was not material because there was not a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

In the face of the evidence, more than supposition on the weak premises offered by Ingram is needed to undermine confidence in the outcome. As the Court stated in *Wood*:

> Whenever a federal court grants habeas relief to a state prisoner the issuance of the writ exacts great costs to the State's legitimate interest

in finality.  And where, as here, retrial would occur 13 years later, those costs and burdens are compounded many times.  Those costs may be justified where serious doubts about the reliability of a trial infested with constitutional error exist.  But where, as in this case, a federal appellate court, second-guessing a convict's own trial counsel, grants habeas relief on the basis of little more than speculation with slight support, the proper delicate balance between the federal courts and the States is upset to a degree that requires correction.

*Wood*, 516 U.S. at 8.

The state habeas court made the following findings and conclusions:

C6.  The Court concludes that as to the affairs, Jan Krocker acted within the bounds of *Brady* by speaking with the victim to determine whether or not anything about the affairs would have been *Brady* material. Mrs. Krocker determined there was not.  As is the case with any material a prosecutor deems not to be *Brady,* she did not reveal the two affairs.

C7.  The Court finds that the two affairs were not *Brady* material.

. . .

C9.  The Court finds that certain factors need to be applied to prior sexual encounters of a victim to determine whether or not *Brady* applies.  For example, the remoteness of the affair to the sexual assault, whether or not the victim is promiscuous; whether or not the victim was married at the time of the sexual encounter, whether or not the victim has a motive to fabricate rape to conceal the affair; and whether the victim has ever made a prior allegation of sexual assault. These and similar factors would be relevant in a prosecutor's analysis in determining whether a prior sexual encounter would be *Brady* material and thus discoverable to a defendant.

F13.  Texas Rule of Evidence 412 was preceded by two provisions of the Texas Penal Code which have since been repealed, initially section 21.13 repealed and later re-codified as section 22.065 which became the precursor to the rule of evidence.  Rule 412 does not substantively change the proscriptions found in its predecessor statutes.

69

C10.  The Court finds that in addition to failing to rise to the level of "material" under *Brady,* evidence of the victim's prior sexual history in the instant case would not have been admissible as no exception to the rape shield law would have applied.  TEX. R. Evid. 412, *Pinson,* 778 S.W.2d at 95.  Moreover, the Court finds that the testimony from the writ hearings fails to establish any finding of family violence.

F14.  In balancing the *Brady* duty with the added duty imposed by Rule 412 on a prosecutor, there is a delicate balance between what is exculpatory or impeaching material and what information about the victim must be protected based on public policy.  The public policy behind the rape shield laws is to protect the victim from becoming victimized again on the stand by having every prior sexual encounter scrutinized and examined for the world to judge.  Jan Krocker explained this public policy in her testimony at the writ hearing when she stated, "[p]robably 30% of the women in this country couldn't testify and prosecute a rape case if they had to reveal who they had sex with six years before and nine years before.  And that's exactly the reason every state in America has enacted a rape shield law".  RR Writ Vol. 6 p.78.

F15.  The information gleaned from the testimony of the two paramours Lynn Daughrity and Roberts Dees as well as the testimony from Barbara Smith and her husband and that of the prosecutor pro tem, Jan Krocker, clearly illustrate the public policy behind Rule 412.

C11.  The Court holds that under the Rule of Evidence 412, Barbara Smith's two prior affairs were not admissible.

. . .

C15.  The Court concludes that the two affairs were not *Brady* material because they were too remote in time to the date of the offense to be of probative value, and, secondly, no exception to Rule 412 applied that would have made evidence of these two affairs admissible.

*Ex parte Ingram*, Application No. 68,200-01 (Event ID: 2321230) at 16-18, 25.

The state habeas court concluded:

C2.  "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable

probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985; *Accord, Kyle v. Whitley,* 514 U.S. 419,453,115 S.Ct. 1555,1575,131 L.Ed.2d 490 (1995)). Consequently, the Court concludes that disclosure of Mrs. Smith's two indiscretions would not have undermined confidence in the outcome. The two affairs were too remote from the time of the actual offense to have impacted the outcome in any manner. In addition, no parallels could be drawn between the kidnapping and rape of Mrs. Smith by the Defendant and the consensual relationships with Mr. Daughrity and Mr. Dees—the victim's two paramours. Clearly, the evidence is not material as there is no "reasonable probability" the result of the proceeding would have been different.

C3. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is "material" either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady* v. *Maryland,* 373 U.S. 83,87, 83 S.Ct. 1194,1196-1197,10 L.Ed.2d 215(1963). The Court finds that the evidence of Mrs. Smith's two affairs was not material either to Applicant's guilt or punishment.

*Ex parte Ingram*, Application No. 68,200-01 (Event ID: 2321230) at 14.

This court must accept as correct any factual determinations made by the state courts unless Ingram rebuts the presumption of correctness by clear and convincing evidence. Ingram has failed to rebut the presumption of correctness. There is no evidence to contradict the state court that *Brady* was not violated. *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998), *cert. denied*, 526 U.S. 1118 (1999). The state habeas court's rejection on the merits of Ingram's *Brady* claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States nor based on an unreasonable determination of the facts in light of the evidence presented in Ingram's state habeas corpus proceedings.

Ingram is not entitled to federal habeas corpus relief on this claim.

**IV.      The Claim Based on a Violation of the Confrontation Clause (Grounds 3 & 4)**

Ingram argues that the district court violated his rights under the Confrontation Clause of the Sixth Amendment when it excluded evidence of Smith's prior affairs, refusing to allow him to confront Smith with evidence of her infidelities.

The Sixth Amendment rights Ingram claims are closely related.  *See Kittelson v. Dretke*, 426 F.3d 306, 318 (5th Cir. 2005) ("The Sixth Amendment right to present a complete defense encompasses a defendant's rights under the Confrontation Clause to rebut the State's evidence through cross-examination.").  The Supreme Court has recognized that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on cross-examinations based on among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.  The relevant inquiry is whether the jury had sufficient information to appraise the bias and motives of the witness." *United States  v. Ramos*, 537 F.3d 439 (5th Cir. 2008) (quoting *United States v. Tansley*, 986 F.2d 880, 886 (5th Cir. 1993) (internal citation omitted)).  "Alleged violations of the Confrontation Clause are reviewed de novo, but are subject to harmless error analysis." *United States v. Bell,* 367 F.3d 452, 465 (5th Cir. 2004).

A defendant is granted substantial leeway in cross-examining a witness to discover bias. *United States v. Whitfield*, 590 F.3d 325, 363 (5th Cir. 2009) (citing *United States v. Anderson*, 933 F.2d 1261, 1276 (5th Cir. 1991)).  However, as the Supreme Court has stated:  "[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  *Delaware v. Van Arsdall*, 475 U.S. 673 (1986) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20  (1985) ( per curiam)

72

(emphasis in original)).  "The Confrontation Clause . . . is satisfied where defense counsel has been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness."  *United States v. Restivo*, 8 F.3d 274, 278 (5th Cir. 1993) (internal quotation omitted).

"The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt."  *Id.*  If a jury might reasonably have questioned the witness's reliability or credibility had further cross-examination been allowed, then the denial of the right to confrontation is reversible error.  *Id.*; *Davis v. Alaska*, 415 U.S. 308, 317 (1974) (refusing to "speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted th[e] [defendant's] line of reasoning had counsel been permitted to fully present it" and concluding that the trial court violated the defendant's Sixth Amendment right to cross-examination by precluding the proffered cross-examination).  A court considers "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."  *United States v. Rodriguez-Martinez*, 480 F.3d 303, 308 (5th Cir. 2007) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

In *United States v. Hitt*, 473 F.3d 146 (5th Cir. 2006), the Fifth Circuit found that the trial court was correct in concluding that the evidence of the complainant's prior sexual acts was only marginally relevant and that introduction of such evidence would be prejudicial and cause confusion. The court explained:

73

[The defendant] sought to impeach [the complainant's] credibility by introducing prejudicial sex act evidence that is only marginally relevant . . . . That [the complainant] was previously sexually abused . . . and discussed it with authorities only after being approached by authorities about the matter has little bearing on whether [the complainant] was truthful in his allegations that [the defendant] sexually abused him. . . . Moreover, allowing this line of questioning would have led to introduction of testimony, through re-direct of [the complainant] and, perhaps, through cross-examination of [another alleged abuser], that [the other abuser] abused [the complainant] not just orally but also anally. The district court's decision to disallow the . . . evidence and to limit the cross-examination . . . on the topic avoided the confusion and prejudice that would have inevitably resulted from examining the facts surrounding the [other] sexual abuse. *See United States v. Tail,* 459 F.3d 854, 861 (8th Cir. 2006) ("Admission of [prior sexual abuse allegations] would have triggered mini-trials concerning allegations unrelated to [the present] case, . . . increas[ing] the danger of jury confusion and speculation.").

*Hitt,* 473 F.3d at 157.[3]

Counsel for Ingram extensively cross-examined Smith.  During that cross-examination, counsel asked Smith about past events and certain inconsistencies between Smith's testimony and her prior statements.  While Smith was certainly an important witness for the government, she was not the only witness.  Testimony from other witnesses indicated that Smith's injuries and other evidence were consistent with sexual assault.

---

[3]   Other circuits have held that evidence of prior sex acts of alleged victims of a sexual assault can be excluded without violating the Sixth Amendment when defendants seek to introduce such evidence to impeach the victim or diminish the victim's credibility. *See United States v. Powell*, 226 F.3d 1181, 1199 (10th Cir. 2000) (rejecting a defendant's constitutional challenge to a district court's exclusion of evidence the purpose of which was to rebut inferences that the victim was "naive," "innocent," or "unsophisticated"); *United States v. White Buffalo*, 84 F.3d 1052, 1053-54 (8th Cir. 1996) (holding that a defendant's Confrontation Clause rights were not violated when the district court excluded testimony and evidence that might "impeach the victim's truthfulness and . . . show her capability to fabricate a story about the rape").

74

That Smith had had two previous sexual affairs years earlier has little bearing on whether she was truthful in her testimony that Ingram kidnapped and sexually assaulted her.  The trial court's decision to disallow the prior-affairs evidence and effectively limit the cross-examination of Smith on the topic avoided the confusion and prejudice that would have inevitably resulted from examining the facts surrounding the prior affairs.  *See United States v. Tail*, 459 F.3d 854, 861 (8th Cir. 2006).  The trial court allowed defense counsel ample room to explore the issue of bias.  For example, on cross-examination, Smith acknowledged that she had filed a worker's compensation claim against McNeil and a civil lawsuit against Ingram.  (Reporter's Record, Vol. XIII, pp. 1604-1605, 1612).  Counsel was "permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *United States v. Restivo*, 8 F.3d 274, 278 (5th Cir. 1993) (internal quotation omitted).

In support of his Confrontation Clause claim, Ingram relies on *Olden v. Kentucky*, 488 U.S. 227 (1988).  In that case, two African-American men were indicted for kidnaping, rape, and forcible sodomy.  The victim of the alleged crimes was a young white woman.  The defense theory was that the complainant concocted the rape story to protect her relationship with the half-brother of one of the defendants.  To demonstrate the motive to lie, the defendant contended that he should be allowed to introduce evidence of that continued relationship.  The trial court granted the prosecutor's motion *in limine* to keep all evidence of the ongoing relationship from the jury.  When the defense attempted to cross-examine the complainant about her living arrangements, after she had claimed during direct examination that she was living with her mother, the trial court sustained the prosecutor's objection.  The defendant was acquitted of kidnaping and rape but convicted of forcible sodomy.  In affirming the conviction, the Kentucky Court of Appeals found that evidence was not barred by the State's

rape shield law.  The court acknowledged that the evidence was relevant to the defense theory.  The appellate court nevertheless held that testimony showing that the white complainant and African-American man were living together at the time of the trial may have created extreme prejudice against the complainant.

In reversing the conviction, the Supreme Court explained that the limit was beyond reason. Speculation as to the effect of jurors' racial biases could justify exclusion of cross-examination with such strong potential to demonstrate the falsity of the complainant's trial testimony.  "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.  Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts.  These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."  *Id*. at 232-233.  This case does not help Ingram.  The restriction on cross-examining Smith about two one-night stands occurring years ago does not show a basis for relief under the *Van Arsdall* factors.

The first *Van Arsdall* factor is the importance of the witness's testimony in the prosecution's case.  Smith's testimony was important to the prosecution's case.  The second *Van Arsdall* factor is whether the testimony concerning Smith's affairs was cumulative.  The defense elicited testimony showing that both Smith and her husband were treated for a sexually transmitted disease in 1984. This tended to suggest that either Smith or her husband had been unfaithful.  The third *Van Arsdall*

76

factor is the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points. Smith's account of events was extensively corroborated by the testimony of law enforcement and medical professionals and by physical evidence. The fourth *Van Arsdall* factor is the extent of cross-examination otherwise permitted. DeGuerin was allowed to cross-examine Smith extensively. DeGuerin also cross-examined the medical professionals on their testimony about Smith's condition. DeGuerin had more than ample opportunity to cross-examine the State's witnesses. The final *Van Arsdall* factor is the overall strength of the prosecution's case. The State's evidence against Ingram was extensive.

In sum, considering the relevant *Van Arsdall* factors, this court concludes "beyond a reasonable doubt" that the restriction on Ingram's right to confrontation was harmless. *United States v. Prior,* 483 F.3d 309 (5th Cir. 2007). DeGuerin explained his theory that Smith falsified the rape charge out of fear of a violent response from her husband. The trial court reviewed the records in camera, including the note about Smith's affairs, and determined that they were inadmissible. The state trial court acted in a reasonable manner, fully consistent with the Confrontation Clause, when it prevented examination of Smith about her marital infidelities.

The state habeas court found:

> C12. The Court is compelled to find Judge Martin's order to seal the records containing the names of the two paramours was not an abuse of discretion. Based in his decision to seal the records, this Court further finds Judge Martin implicitly ruled that the victim's prior sexual history was inadmissible. By virtue of his decision, Judge Martin made it clear in his ruling that the probative value of any evidence related to the two paramours would not have outweighed the prejudicial effect.

> C13. The Court finds that by ruling the documents containing the names of the two paramours remain sealed, the judge held any evidence of the two prior affairs inadmissible[.]

C14.  *Pinson v State* is instructive as to whether or not rape shield laws interfere with a defendant's right to cross-examination to such an extent as to violate a defendant's rights under the Sixth Amendment of the U.S. Constitution and Article 1, Section 10 of the Texas Constitution.  778 S.W.2d 91, 95 (Tex. Crim. App. 1989).  The Court of Criminal Appeals explained, "[e]ven though it is not to be doubted that a defendant has an undeniable right to confront and cross-examine his complaining witness, rape shield laws such as § 22.065 merely codify procedural rules regarding admission of relevant evidence by prescribing a mechanism to test the relevancy of the proffered evidence, and thus do not unduly restrict a defendant's substantive confrontational right".  *Pinson*, 778 S.W.2d at 95.

. . .

F36.  Dick Deguerin subpoenaed the file of Mrs. Smith's workman's compensation attorney.  Her workman's compensation attorney, Bal Kale, turned over non-privileged portions of the file to both the State and the Defense.  However, those portions that Mr. Kale felt were privileged were turned over to Judge Martin for an in camera inspection.  Upon reviewing the in camera documents, the judge ruled that those documents would remain sealed for future purposes.  RR Vol. 13 p. 1490.  It is within those sealed documents that the two names of the paramours were discovered by Applicant.  RR Writ Vol.6 pp. 22-23.

F37.  Presumably, Judge Martin saw the names of the two paramours.  The writing on the page that contains the names is large and Judge Martin states on the record he reviewed the documents.  RR Vol.13 p. 1490.  Following his review of the documents he made no substantive changes to either sides' motions in limine.  RR Writ Vol. 6 p.23.

. . .

C16.  The Court finds Judge Martin's order to seal the records containing the names of the two paramours was not an abuse of discretion.  Based on his decision to seal the records the Court further finds Judge Martin implicitly ruled the victim's prior sexual infidelities were inadmissible.  The Court finds that the admission of the victim's prior sexual history would have been a flagrant violation of Rule 412.

*Ex parte Ingram*, Application No. 68,200-01 (Event ID: 2321230) at 12-30.

The state habeas court's rejection on the merits of Ingram's Confrontation Clause error claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States nor based on an unreasonable determination of the facts in light of the evidence presented in Ingram's state habeas corpus proceedings.

Ingram is not entitled to federal habeas corpus relief on this claim.

## V.    Conclusion

The respondent's motion for summary judgment, (Docket Entry No. 18), is granted. Ingram's petition for a writ of habeas corpus is denied.  This case is dismissed.[4]

Under the AEDPA, a petitioner must obtain a Certificate of Appealability before appealing the district court's denial of habeas relief.  28 U.S.C. § 2253(c)(2).  A certificate will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make such a showing, a petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further."  *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (citation and internal quotation marks omitted).  "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'"  *Id*. at 1040 (citing *Slack v. McDaniel*, 529 U.S. 473, 484).  Ingram has

---

[4]   Ingram's motion for admission of transcripts of telephone conversations, (Docket Entry No. 16-1), is granted.  Ingram's motion for production of supplemental transcript, (Docket Entry No. 16-2), is denied as moot.

not made "a substantial showing of the denial of a constitutional right."   A certificate of appealability will not issue.

SIGNED on March 10, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge